[No. G021018. Fourth Dist., Div. Three. July 15, 1997.]

In re KIMBERLY F. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v.
DORIS F., Defendant and Appellant.

COUNSEL

Marsha Faith Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Laurence H. Watson, County Counsel, and Mark R. Howe, Deputy County Counsel, for Plaintiff and Respondent.

Harold LaFlamme, Craig E. Arthur and Karen Cianfrani, under appointments by the Court of Appeal, for Minors.

OPINION

SILLS, P. J.—Like many juvenile dependency cases, this is a hard one. Doris F. lost custody of her two youngest children when, while caring for a nearly adult son with AIDS, social workers found her home to be dirty and

unsanitary. By the time of the 18-month review, she was making progress, but not enough, so reunification services were terminated. But in the time between the 18-month review and the scheduled permanency planning hearing, she managed to show that she could keep her home in a sanitary condition. The home was clean and safe. Moreover, the close emotional ties between her and her children remained intact. She brought a modification request under section 388 of the Welfare and Institutions Code seeking return of the children, but that request was denied, precipitating this appeal.[1]

It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion, but this is such a case. As explained below, the reason for the dependency was not as serious as other, more typical reasons for dependency jurisdiction, such as sexual abuse, physical abuse or illegal drug use—and the removal of that reason constituted a genuine change of circumstances. Moreover, the juvenile dependency court based its decision in terminating reunification in part on a psychologist's opinion that the mother had a "narcissistic" personality, a factor which simply cannot serve as a basis for the removal of children from their parents, or a decision not to return them.

The section 388 hearing showed the children's ties to their mother to be strong—despite her supposed "narcissism"—and further showed her to be a devoted and caring parent. The evidence also showed the children's ties to the mother be strong *relative* to those of their current caretakers (who have, we must add, done an excellent job—more on that anon). The two younger children are also fondly attached to their two elder brothers who remain with the mother. When the case is taken as a whole, in context, and in the light of our Supreme Court's explication in *In re Marilyn H.* (1993) 5 Cal.4th 295 [19 Cal.Rptr.2d 544, 851 P.2d 826] of the role section 388 plays in our dependency system, we conclude that the juvenile court abused its discretion in not granting the motion.

### FACTS AND STATEMENT OF THE CASE[2]

Doris F. has four children. One of these is a teenage son, Nathan, 18, who has AIDS as the result of a blood transfusion. Her other children are

---

[1]All statutory references are to the Welfare and Institutions Code.

[2]It is impossible to give the reader an accurate "feel" for what is really going on in most juvenile dependency cases without integrating the statement of the case with the statement of facts. (See Cal. Rules of Court, rule 13.) Counsel for the mother has done an excellent job in presenting a readable, integrated narrative to the court, and we encourage all counsel who file briefs in dependency cases to write an integrated statement, rather than preparing separate statements of the procedural history and the facts, which suggest that the real world events involving the parents and children somehow took place apart from the dependency litigation which dominated the lives of the family involved over a period of many months.

Mathew, now going on 16; Kimberly, age 10, and Leon, age 7. Kimberly and Leon were removed from Doris's three-bedroom home in late 1994 when Leon tripped on a pile of newspapers in the home and cut his head on an empty soup can. Social workers who later investigated the home found a strong odor caused by dirty animal cages and garbage (from Nathan's pets), and the home in generally "an unsanitary condition." Social workers then filed dependency petitions concerning Nathan, Kimberly and Leon based on the filthy home.[3] Those petitions were sustained; Nathan remained in *Doris's* custody, and Kimberly and Leon were placed with their paternal aunt and uncle. Doris was given four hours of unmonitored visitation per week, plus a reunification plan involving counseling, parenting classes, and a requirement she keep her home clean and safe. Mathew never was the subject of dependency proceedings.

Nathan's health was not good over the next six months; he was in and out of the hospital. When the six-month review came around in August 1995, social workers believed that conditions in Doris's home were not suitable to warrant the return of Kimberly and Leon; however, social workers also recommended that the juvenile dependency court appoint a psychologist to evaluate Doris. At the six-month review the two younger children were not returned; the court appointed Dr. Donald Smith. In a report prepared just prior to the January 1996 12-month review, Dr. Smith described Doris as: "narcissistic, egocentric, and self-centered," "cynical, passive-aggressive, rigid, and easily argumentative," "sullen, mistrustful, and generally self-indulgent," "a very angry, dolor woman, who appears to feel the lethargy, stress, and strain of looking after her children," inclined to behave in a "negativistic, melancholic, and envious manner," and suffering from a "histrionic condition." He also opined that Doris's "overall attitude appears marked by her conservative nature" and that "[t]here appears to be an *over-concern* with interpersonal warmth in the home, which may be a major area of difficulty." (Italics added.)

Dr. Smith allowed, however, that Doris did not "harbor any anti-social practices, beliefs and/or propensities."

At the 12-month hearing social workers reported that Doris's home had not improved; it appeared that she had even rejected some cleaning help from the AIDS Service Foundation. Though Doris did not show up for the

---

[3]Kimberly had been sexually abused by her father nine months earlier, about April 1994. The father admitted the crime; Doris was cooperative in the investigation. The mother and father have been divorced since 1988 and the father does not live with Doris and the children. There is no issue in the present case concerning Doris's ability to protect Kimberly from molestation.

12-month review, since there had been some compliance with the service plan reunification services were not terminated.

For the rest of the winter and spring of 1996, the house remained cluttered and unsanitary. A worker provided through Boys Town was appalled at the conditions; he noted there was a dead turtle that had been in the home for several months, that there were aquariums (where Nathan kept his pet lizards) filling up with feces, and two large cups, as yet unemptied, filled with urine and vomit—apparently from Nathan's illness. After the worker filed his report, the family refused to let him in the house. Doris was also inconsistent in attending therapy sessions.

By July 1996, however, when the 18-month review rolled around, conditions in the house were improving. Doris had accepted help from a friend in starting a cleaning project. The kitchen, living room, dining room and hallway were now clean and free of clutter, albeit the bedrooms and bathrooms were still dirty and cluttered.

Meanwhile, Kimberly and Leon were doing very well in the care of their paternal aunt and uncle.

Despite the beginning of some improvement of conditions in the home, the juvenile court found that return of Kimberly and Leon would be detrimental to the children. The juvenile court judge based his decision on both the condition of the home and on what he termed "the mother's psychological disorder, the narcissistic personality." The judge thought that Doris was "resistant to any therapy or treatment" and that her "problem is one which would take many months or perhaps years to address." A permanency planning hearing pursuant to section 366.26 was set for December 19, 1996.

Doris filed a petition for a writ of mandate, challenging the termination order. Among her arguments was that there was insufficient evidence to support the detriment finding.

In an unpublished decision, this court affirmed the order, noting that the conditions in the home were much worse than the trivial hazards described in *In re Paul E.* (1995) 39 Cal.App.4th 996 [46 Cal.Rptr.2d 289]. We described the conditions as "extreme, causing a unanimous reaction from all of the many support persons who came in contact with the family." Indeed, we lamented that while "the record is clear that both Kimberly and Leon love their mother and would like to live with her if possible, the mother produced no significant evidence that the children could safely return." We did *not* rely, however, as the juvenile court judge did, on the psychologist's

opinion that Doris had a "psychological disorder" or "narcissistic personality."

Further, in confronting Doris's assertion that she was "able to cope" with her home, we observed, in a footnote: "If the mother *is* able to improve and maintain her home in a safe condition, she can and should file a motion under section 388 to modify the juvenile court's findings." (Original italics.)

Our unpublished opinion on Doris's writ petition was filed December 9, 1996, just 10 days prior to the originally scheduled permanency planning hearing. Apparently taking her cue from our footnote in that opinion, Doris filed, on December 19, 1996, a formal petition to modify the termination of reunification services. Doris sought immediate return of the children, or, in the alternative, six more months of reunification services.

Doris's moving papers mentioned four new developments: (1) since the 18-month hearing her house had remained clean and safe; (2) she had been taking a parenting class (apparently in addition to classes previously required as part of her service plan) since August 1996; (3) she had also been attending a sexual molestation support group to help her understand "what Kimberly went through"; and (4) a different psychologist, Dr. JoAnn Brannock, had examined Doris in November and concluded that Doris did not exhibit any "psychopathology." In contrast to Dr. Smith, Dr. Brannock described Doris as a "concerned mother who has felt that the legal system has treated her unfairly."

The permanency planning hearing was postponed for a day to coincide with the hearing on Doris's petition. After denying Doris's request for a continuance to allow Dr. Brannock—who was otherwise unavailable—to testify later, the hearing on the petition was conducted. Essentially, the evidence showed what Doris had alleged in her petition: Her house was no longer unsanitary, she was taking the parenting class and attending the support group, and a psychologist had prepared a report indicating that Doris did not suffer from some psychopathology. On the opposite side, a social worker who had visited Doris's home testified that she saw several extension cords through stacks of newspapers, books and clothes.[4] There was also a crack in the aquarium where Nathan has been keeping his pet lizard, Rosco. However, it was undisputed that Doris had turned around the aquarium so the cracked side was facing the wall, away from Nathan, and that none of the extension cords were frayed.

The juvenile judge denied the modification request, noting that it was "very familiar with the circumstances of this case," having heard testimony

[4]The social worker initially described the newspapers, books and clothes as "debris."

from the therapist and Dr. Smith at the 18-month review. The judge stated he did not find Dr. Brannock's report "the slightest bit compelling," and found "no change in circumstances." Further, he declared that the proposed modification would not be in the best interests of the minors.

The court proceeded with the permanency planning hearing. The testimony was undisputed that Doris had maintained a very close bond with her children. When she and Nathan visited, Kimberly and Leon would come running to greet them, and tell them anything new or anything they were proud of. The social worker also admitted that the children were equivocal (at best) about being adopted by their paternal aunt and uncle; when asked, Kimberly did not answer and Leon said he "couldn't talk about it."

After the hearing, Doris's parental rights vis-à-vis Kimberly and Leon were terminated, with adoption selected as the permanent plan. Doris now appeals from both the order denying her section 388 modification petition and the order terminating her parental rights. She claims the denial of her modification petition was an abuse of discretion. She further claims that the evidence of the strong bond between her and the children essentially compelled the court to find that termination of her rights would be detrimental to the children. (See § 366.26, subd. (c)(1)(A).) Because we conclude that her section 388 argument is dispositive, we need not address Doris's contentions regarding the permanency planning issues.

DISCUSSION

*A Simple Comparison Between the Household of the Parents and the Household of the Caretakers Is Not Dispositive of a Child's "Best Interests" Under Section 388*

Modification orders in juvenile dependency court are authorized by section 388. Essentially, the statute requires a showing of a change of circumstances and that modification based on that change would be in the "best interests" of the minor children.[5] In the present case, it is undeniable that Doris showed such a change of circumstance: Her home was no longer

---

[5]Read literally, section 388 does not impose a "best interests" standard on the *merits* of a modification request; it merely says that *if* it is *apparent* that the best interests of the child "may be promoted" by the request, then the juvenile dependency court "shall" order a *hearing*. Nevertheless, case law, including several decisions of our Supreme Court, has consistently treated the statute as imposing a best interests standard on the proposed modification itself (as distinct from the hearing on the proposed modification). (E.g., *In re Jasmon O.* (1994) 8 Cal.4th 398, 415 [33 Cal.Rptr.2d 85, 878 P.2d 1297] [observing that at the hearing on the section 388 motion, the "juvenile court's task was to determine whether" the

in an unsanitary and unsafe condition. The worst the social worker could point to was a few extension cords and some general "clutter" of newspapers, books and clothes—the kind of trivia which *would* bring the case within the purview of *In re Paul E.*, *supra*, 39 Cal.App.4th 996, 1005 (shorted lamp socket, exposed motor boat propeller, and dirty wading pool did not justify removal of child). Had Doris's home been in such a condition by any of the periodic six-month reviews, there is no question that Kimberly and Leon would have been returned.

That leaves only Dr. Smith's characterization of Doris as "narcissistic," "self-centered" "dolorous" and—of all things—"generally conservative." Those are, at the absolute worst, literary descriptions of eccentricity, not tendencies to harm children. They cannot carry any weight in showing detriment. The government cannot remove children from their parents because a psychologist opines that a parent is "narcissistic." (See *Blanca P.* v. *Superior Court* (1996) 45 Cal.App.4th 1738, 1751 [53 Cal.Rptr.2d 687] [psychologist's opinion that parent had failed to "internalize" general parenting skills was too vague to constitute substantial, credible evidence of detriment].) If narcissism could constitute a basis for dependency, the children of many able and important leaders, not only in politics but academia, the arts—and certainly law—would be subject to removal.

It was mere icing on the cake that, by November, Doris had found a psychologist who was willing to take a more charitable view of her personality.[6] The key change was in the condition of the house, which was the only *legitimate* obstacle to the children's return.

---

moving party "had demonstrated by a preponderance of the evidence that there was new evidence or a change of circumstances" that it was in the child's "best interests" that the previous order be changed]; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [27 Cal.Rptr.2d 595, 867 P.2d 706] [observing that "ultimate question before" juvenile court on section 388 motion for change of placement was "the best interests of the child"]; *In re Zacharia D.* (1993) 6 Cal.4th 435, 455 [24 Cal.Rptr.2d 751, 862 P.2d 751] [observing that substantial risk of detriment standard under section 366.22 is "arguably more stringent than the 'best interests of the child' standard of section 388"]; *In re Edward H.* (1996) 43 Cal.App.4th 584, 594 [50 Cal.Rptr.2d 745] ["the critical question was whether the best interests of the children might be promoted by the proposed change of order (§ 388)"]; *In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577 [49 Cal.Rptr.2d 713] ["In order to grant a petition pursuant to section 388, there must be a substantial change in circumstances regarding the child's welfare and the requested modification of the prior order must be in the child's best interests."]; *In re John F.* (1994) 27 Cal.App.4th 1365, 1375-1376 [33 Cal.Rptr.2d 225] ["Petitioner's burden on a section 388 motion is to show by a preponderance of the evidence that modifying the extant order promotes the child's best interests."].)

[6]Accordingly, we do not need to address Doris's contention that the juvenile court abused its discretion in not continuing the section 388 hearing to accommodate Dr. Brannock's schedule. All Dr. Brannock would have done was to counter the previous "narcissistic" diagnosis, which was of no import anyway.

■ The most sustained reflection on the nature and role of section 388 appears in our Supreme Court's decision in *In re Marilyn H.*, *supra*, 5 Cal.4th 295. Essentially, *Marilyn H.* teaches us that section 388 *really is* an "escape mechanism" when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights. (See *Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) As such, section 388 is vital to the *constitutionality* of our dependency scheme as a whole, and the termination statute, section 366.26, in particular. (See 5 Cal.4th at p. 309.)

*Marilyn H.*, like the case before us, arose out of poor living conditions. In *Marilyn H.*, however, the conditions were much worse. The two children who were the subjects of the case lived in a fourteen-foot trailer with broken windows and holes in the open desert with no electricity or running water. (See 5 Cal.4th at p. 298.) The case progressed through an 18-month hearing where reunification services were terminated because the parents had only shown "moderate compliance" with the reunification plan. Then—as so often happens in dependency cases—the parents *began* to get their act together in the 120 days between the 18-month review and the permanency planning hearing: They completed programs which were part of the reunification plan regarding a third child born during the pendency of the proceedings concerning the first two children. At the permanency planning hearing conducted pursuant to section 366.26, the mother requested that the court consider returning the minors to her custody based on changed circumstances. The court said no, and established a guardianship.

The mother challenged the order, but the Court of Appeal affirmed, reasoning that the placement options set forth in section 366.26 are exclusive. Those options also preclude consideration of return to parental custody at a section 366.26 hearing. The court held, moreover, that section 366.26 does not violate parents' due process rights *when read in conjunction with section 388.* (See 5 Cal.4th at pp. 298, 300.)

In a decision which explained the role of section 388, the Supreme Court agreed. The high court declared that "[s]ection 388 provides the 'escape mechanism' that mother maintains must be built into the process to allow the court to consider new information." (5 Cal.4th at p. 309.) *"Even after the focus has shifted from reunification,* the scheme provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status." (*Ibid.*, italics added.) The Supreme Court further pointed out that ". . . the Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order." (*Ibid.*)

*Marilyn H.* makes clear that reunification pursuant to section 388 must remain a viable possibility even after the formal termination of reunification services in a 12- or 18-month review if there is, as the court put it, a "legitimate change of circumstances." The high court did not, however, have occasion to explore the nature of the "best interests" aspect of section 388. Obviously, though, one thing is clear at the outset: It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. (See *In re Sylvia R.* (1997) 55 Cal.App.4th 559 [64 Cal.Rptr.2d 93] [fact that spousal abuse charges were dropped did not show even possibility that undoing reunification services was in the best interests of minor children].)

That the statute speaks of the dependent child's *best* interests necessarily presents a temptation to juvenile and appellate courts which should be brought out in the open, for it must certainly cross the mind of every judge involved in dependency proceedings. That temptation is to simply compare the household and upbringing offered by the natural parent or parents with that of the caretakers. One might describe that approach as the "simple best interest test." In the present case, that temptation is particularly acute because the caretakers have done a truly excellent job of rearing Kimberly and Leon during the period of dependency.

More than a decade ago, *In re Cheryl E.* (1984) 161 Cal.App.3d 587 [207 Cal.Rptr. 728] touched on the concerns raised by a "simple best interest" comparison, and in particular on the judicial temptation to simply define a child's "best interests" in a vacuum, apart from his or her familial relationships. *Cheryl E.* was a case where the social and economic disparity between the natural parents and the caretakers was greater than it is here. Even so, the court declared: "[W]e cannot encourage, under the guise of 'best interests' or 'home stability,' the arbitrary determination by a governmental agent that a well-educated 'professional' couple will be better parents than 'red-necked hillbillies' (AW's words, not ours) who are on welfare and have six other children." (*Id.* at pp. 606-607.)[7]

In light of *Cheryl E.*, whether a child is reared in a more mainstreamed or socioeconomically advantaged household is not dispositive under section 388. It is not, after all, in the court's authority to "play God" and determine which of two households a child should have been born into.

In statutory terms, the "simple best interest test" provides an incomplete picture of "best interests" under section 388. It ignores all familial attachments and bonds between father, mother, sister and brother, and totally

---

[7]The "AW" in the quote was an adoption worker. (See *In re Cheryl E.*, *supra*, 161 Cal.App.3d at p. 594.)

devalues any interest *of the child* in preserving an *existing family unit*, no matter how, in modern parlance, "dysfunctional."[8] It fails to account for the complexity of human existence, substituting in its stead a one-dimensional comparison which does not adequately address the child as a whole person, including his or her formative years with a natural parent. After all, the Legislature used the plural, "best interest*s*," rather than the singular "best interest," thereby indicating a more complex standard than a unidimensional comparison between households.

Moreover, as a matter of stare decisis, to interpret "best interests" in terms of a simple comparison between two households is to contravene the role of section 388 as explained by the *Marilyn H.* court. Due process, said our high court, was satisfied in *Marilyn H.*, even against the claim that changed circumstances justified reunification, precisely *because* of the *escape mechanism* provided by section 388. (5 Cal.4th at p. 309.) Clearly—unless the *Marilyn H.* court was just wasting ink and the existence of section 388 is only a sham to provide formal window dressing for a statutory scheme which is dead set against parental reunification after an unsuccessful 12- or 18-month review—the best interests standard cannot be a simplistic comparison between the natural parent's and the caretakers' households.

*Determining a Child's Best Interests Under Section 388 Involves Looking at a Number of Factors Generally Falling Along a Continuum*

■ As we have just demonstrated, best interests is a complex idea. Given that a one-dimensional "better household" test is not dispositive, the logical conclusion is that a number of factors should be examined. Most of the time such factors will fall along a continuum, one extreme of which is the notion that just because a parent makes relatively last-minute (albeit genuine) changes he or she is entitled to return of the child, the other is the obvious attractiveness of insuring that the child remains with highly functional caretakers. Neither extreme can be dispositive. In the middle are a number of factors which may be derived from the existing dependency statutes themselves, and which drive a case in one direction or another.

First, and probably most basic, any modification under section 388 must consider the seriousness of the reason for the dependency in the first place. Not all reasons for initial dependency jurisdiction are equal from the point of view of a child's interests. Also, one of the most important requirements in

---

[8]Tolstoy said that all happy families resemble one another, but each unhappy family is unhappy in its own way. The modern cliché is that there are nothing but "dysfunctional" families, and sometimes it must seem that every teenager believes that he or she is living in a "dysfunctional" home. The juvenile dependency system, however, exists to protect abused and neglected children, not serve as a kind of super-psychologist.

the juvenile dependency statutes is that reunification services must be directed at helping the parent overcome the problems which led to the dependency. (E.g., § 366.21, subd. (f).) It is only common sense that in considering whether a juvenile court abuses its discretion in denying a section 388 motion, the gravity of the problem leading to the dependency, and the reason that problem was not overcome by the final review, must be taken into account.[9]

A second important factor which is inherent in the statutes is the strength of the existing bond between the parent and child, which, interestingly enough, was considered potentially so important by the Legislature that it can even derail adoption as a permanent plan. (See § 366.26, subd. (c)(1)(A).)[10] If the Legislature thought existing bonds so important that they could deny a child the stability and permanence of an adoptive home, it is unthinkable that the Legislature did not contemplate that the strength of the bonds to the natural parent should not be considered in a section 388 motion.

Correlatively, the strength of a child's bond to his or her present caretakers, and the length of time a child has been in the dependency system in relationship to the parental bond are also vital. (See generally, *In re Jasmon O.*, *supra*, 8 Cal.4th 398.) While the bond to the caretaker cannot be dispositive (see *id.* at p. 418 [". . . the existence of a successful relationship between a foster child and foster parent cannot be the sole basis for terminating parental rights"]), lest it create its own self-fulfilling prophecy, our Supreme Court made it very clear in *Jasmon O.* that the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion. (See 8 Cal.4th at pp. 408, 414-422.)

Finally, of course, the essence of a section 388 motion is that there has been a change of circumstances. Accordingly, the nature of the change, the ease by which the change could be brought about, and the reason the change was not made before bear on any such motion.

[9]For example, we doubt that a parent who sexually abused his or her child could ever show a sufficient change of circumstances to warrant granting a section 388 motion. Likewise the parent who loses custody of a child because of the consumption of illegal drugs and whose compliance with a reunification plan is incomplete during the reunification period. It is the nature of addiction that one must be "clean" for a much longer period than 120 days to show real reform.

By contrast, we dare say that even the most compulsive housekeeper would agree that a dirty house case generally lies at the other end of the continuum from sexual abuse and drug cases. After all, some very able and "functional" people—even United States Supreme Court justices—have been known to live in extreme "clutter," with books and newspapers lying about in great stacks on the floor.

[10]To be specific, the bond must be strong enough that it would be detrimental to terminate parental rights in a situation where adoption could otherwise be the permanent plan.

Summarizing these factors: (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. While this list is not meant to be exhaustive, it does provide a reasoned and principled basis on which to evaluate a section 388 motion.

### *Denial of the Section 388 Request Was an Abuse of Discretion*

 Here, the facts uniformly favor the parent. A dirty house does not pose as intractable a problem as a parent's drug ingestion, or physical and sexual abuse, for a child's "best interests." Moreover, the record shows the problem to have been removed—the worst the social worker could do was to point to some clutter and extension cords.

True, when real mental illness is involved a "dirty house" case will tend to move away from the parent's side of the continuum. But where, as here, the reason for poor housekeeping is supposedly some vague characterization about a "generally conservative" and "narcissistic" personality, there is really nothing *but* poor housekeeping to be held against the parent. As we have stated earlier, the government cannot take away—or refuse to give you back—your children because some psychologist applies unflattering labels to your personality. "[T]he law," wrote Justice Mosk in *In re Stephanie M.*, *supra*, 7 Cal.4th 295, 326, "is not in thrall to passing psychological theory." How much less so is it in thrall to mere name-calling. Furthermore, as an *explanation* for the previous unsanitary condition of the house, "narcissism" pales in comparison to the obvious reason: *Doris has been caring for two teenage sons, one of whom has been stricken with AIDS.*

The section 388 motion also showed that an undisputedly strong bond exists between the mother and her children—a bond which is strong enough, it appears, to vitiate the children's desire to be adopted by their caretakers. Doris has had a substantial amount of unmonitored visitation during the period of dependency, and has shown herself to be devoted to Kimberly and Leon in that time. The evidence also showed strong bonds *between the children as siblings.*

The third factor, the degree to which the problem may be easily removed and the degree to which it has been, requires us again to confront the juvenile court's narcissism rationale. It is clear from the record—particularly the trial judge's reference to the testimony of the therapist and Dr. Smith at the 18-month review—that the decision not to grant the section 388 motion

was largely animated by the judge's adoption of the "narcissistic personality" rationale. While this court was able to uphold the judge's decision at the 18-month review based on the dirty house alone, it bears repeating that the government cannot separate children from their parents based on a psychologist's estimation that a parent is "narcissistic, egocentric, and self-centered," "cynical, passive-aggressive, rigid, easily argumentative," "sullen, mistrustful, and generally self-indulgent." We are not dealing here with real mental illness, but with a description of human personality.[11]

In addition to all the factors favoring the parent, the two constituent reasons behind the juvenile court judge's decision not to return the children at the eighteen-month review were of no force. One of those reasons (unsanitary conditions) had been physically eliminated; the other (the narcissism) was, as we have explained, never of any legal importance anyway. Given that both factors favored the parent and that the reasons the children were not returned at the 18-month review were not viable, denial of Doris's section 388 request really was an abuse of discretion.

We may check our conclusion by comparison with *In re Stephanie M.*, *supra*, 7 Cal.4th 295. *Stephanie M.* is required reading for any Court of Appeal even halfway considering reversing a juvenile court's denial of section 388 motion, because there our high court ever so mildly scolded the appellate court for having "reweighed the evidence and substituted its judgment for that of the juvenile court." (See 7 Cal.4th at p. 319.)

The problem which prompted the dependency in *Stephanie M.* was serious indeed: severe physical abuse of a one-year-old child—so severe, in fact, that when the child was brought to a hospital, she had bone fractures, substantial bruising, and was diagnosed as suffering from battered child syndrome. The parents gave the lame excuse that there had been an accident. (7 Cal.4th at p. 319.) Medical reports, however, showed the injuries to be nonaccidental. The child was shown to be undernourished and exhibiting an extreme fear of her father and men in general. (See *id.* at p. 304.) At a detention hearing the child was placed in foster care.

After dependency was established, the maternal grandmother, who lived in Mexico, stepped forward and offered to care for the child. County welfare officials initially supported the idea, as the child and the grandmother were attached to each other. The foster parents, however, expressed a concern that

---

[11]Other descriptions might be different, of course. If a psychologist labeled a parent as a "pedophile," for example, or "sadistic," any court should sit up and take notice. What is remarkable about the present case, by contrast, is the absence of any *clinical* description of a real pathology, and the substitution in its stead of terms describing character and personality.

placement with the grandmother would be dangerous, as she did not appear to grasp the fact that the parents had seriously abused the child, and by the time of the disposition hearing some three months into the case, the social worker supported, and the court ordered, continued foster care. (7 Cal.4th at p. 304.) After the 12-month review, the juvenile court held a hearing, stipulated to be pursuant to section 388, on whether the child should be placed in the current foster home or with a relative (presumably the grandmother). (See 7 Cal.4th at p. 306.)

At the section 388 hearing it was shown that the child was extremely fragile and in need of stability. (See 7 Cal.4th at p. 307.) The child had "an extensive history of emotional trauma and had posttraumatic stress reaction to severe abuse suffered in her first year of life." (*Ibid.*) Moreover, there had been a long stretch during which the grandmother did not visit or contact the child, and after the visits she did have the child returned with various kinds of adverse emotional reactions. (*Ibid.*) The grandmother was also apparently unable to protect the child from parental contact, and the child now suffered anxiety when separated from the *foster* mother. (*Id.* at p. 308.) The juvenile court denied the section 388 motion for a change of placement, but the Court of Appeal reversed, concluding that the juvenile court had failed to accord "sufficient weight" to the statutory preference for placement with relatives and to a report from a Mexican social services agency that the grandmother was a suitable placement, and had elevated a concern for the child's bond with the foster parents over the interest of the family in preserving familial ties. (See 7 Cal.4th at p. 319.)

In doing so, as the Supreme Court later held, the Court of Appeal erred: The statutory preference for relative placement is not "an evidentiary presumption" in their favor. (7 Cal.4th at p. 320.) The emphasis on the suitability of the grandmother's home was misguided, because the proper focus was on the *child's* interests, not the grandmother's. (See *id.* at p. 323.) The Court of Appeal erred by "giving too great weight" to the grandmother's interest in maintaining a family tie at a point when "the interest of the child in stability had become paramount." (*Id.* at p. 324.) Finally, the Court of Appeal also erred in allowing considerations of national sovereignty and complaints against the local welfare department into a proceeding whose fundamental focus was, after all, "the best interests of the child." (*Ibid.*)

We believe our decision that the juvenile court here abused its discretion passes muster when scrutinized in the light of *Stephanie M.* In *Stephanie M.*, the initial basis for the dependency was strong—the horrible battering of an infant child. Here, the basis was much weaker—a dirty and unsanitary home, and even that is explained by the fact that Doris was caring for a teenage son

with AIDS. In *Stephanie M.*, the emotional and physical fragility of the child created a particular need for the stability of continuity in foster care; here, there is no such evidence of fragility. In *Stephanie M.*, the bond between the grandmother had grown weak; the bond with the foster mother grew so strong that the child was anxious when she was separated from her foster parents. Here, Doris has continued to maintain a strong bond with her children, and that bond is so strong as to have made the children ambivalent about adoption by their caretakers. Finally, here, unlike *Stephanie M.*, there is substantial evidence of sibling attachments the severing of which would certainly subject *these* children to some emotional distress.

DISPOSITION

The juvenile court abused its discretion in denying the section 388 motion. Doris was already in the process of improving her home when the 18-month review hearing was held and the only legitimate reason the children were not returned at *that* time was unsanitary conditions in Doris's household. Thus the basis for the detriment finding at the 18-month review had been eliminated by the time of the section 388 hearing.

A section 388 motion is aimed at modifying a *prior* order. Here, the prior order was the one made at the 18-month review, terminating reunification services and referring the case to a permanency planning hearing under section 366.26. Had there been no detriment finding at the 18-month review, the juvenile court would have had no choice but to immediately return the children (see § 366.22, subd. (a)), albeit it could do so under a family maintenance plan, which in fact was an option requested by Doris in her section 388 motion.

Given the nature of the detriment finding at the 18-month review, and the concomitant showing of new circumstances and best interests made in the section 388 motion, the logic of our decision today is that the case should be returned to the juvenile court with directions to return the children (unless, of course, current circumstances would justify a new detriment finding). Whether a plan of family maintenance should remain in effect, or juvenile dependency jurisdiction be terminated altogether, is a matter which is properly left at this stage to the juvenile court. Also, nothing in this opinion should be construed to prejudice the social service agency's right to bring further proceedings based on developments *after* the section 388 motion. Sanitary conditions in Doris's household must obviously continue to be maintained.

Our disposition renders it unnecessary to address Doris's other contentions, which concern the judgment terminating parental rights. That judgment must also, in light of the abuse of discretion on the section 388 motion,

be reversed as well. Moreover, there is now no need to decide Doris's motion to take additional evidence bearing on one of those issues.

Wallin, J., and Rylaarsdam, J., concurred.