Filed 1/15/14  In re J.Z. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.Z. et al., Persons Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>E.A.,<br><br>        Defendant and Appellant. | A137106<br><br>(Sonoma County<br>Super. Ct. Nos. 3534DEP, 3535DEP, 3536DEP) |

**INTRODUCTION**

In this juvenile dependency case, appellant E.A. (Mother) filed a petition to modify the court's prior order by returning her three sons, J.Z., F.A., and E.S. (Minors) to her custody.  At a combined hearing on Mother's petition and on the selection of Minors' permanent placement hearing, the juvenile court denied the petition, selected adoption as Minors' permanent plan, and terminated Mother's parental rights.

On appeal, Mother contends: (1) the juvenile court abused its discretion in denying her petition to modify; (2) the juvenile court's finding of adoptability is not supported by substantial evidence[1]; and (3) the juvenile court erred in terminating Mother's parental rights, because Minors have a beneficial relationship with her that outweighs the benefits of adoption.  We reject these contentions, and affirm the juvenile court's order.

---

[1]  As discussed *post*, this contention was withdrawn in Mother's reply brief.

## FACTS AND PROCEDURAL BACKGROUND

Minors J.Z., born in 2001, and F.A., born in 2003, share the same father, J.C., who was married to Mother at the time of their birth. J.C. died of leukemia in 2006, before these dependency proceedings began. Minor E.S., born in 2008, has a different father, L.H.

Starting in 2007, after J.C. died, Mother was investigated several times due to concerns about the adequacy of her care of Minors. In 2008, E.S. tested positive for methamphetamine at birth. Mother admitted using methamphetamine, but denied she was addicted. In June 2009, the home in which Mother and minors lived was found to be so unkempt, unsanitary, and unsafe that Minors had to be taken into protective custody. For about six months in 2009, J.C.'s sisters took care of J.Z. and F.A. while Mother was in substance abuse treatment, which Mother undertook voluntarily.

In April 2009 and again in December 2010, E.S.'s father, L.H., committed acts of domestic violence against Mother. As a result of the December 2010 incident, L.H. was arrested and charged with a felony, and the criminal court issued a three-year domestic violence protective order. When the dependency petition was filed in January 2011, L.H. was in jail, and was expected to be deported. Soon thereafter, he was released to the federal immigration authorities, and after that, his whereabouts became unknown. Mother later reported hearing that he was in Mexico. He did not participate in the proceedings in the juvenile court, and is not a party to this appeal.

On January 27, 2011, the Sonoma County Human Services Department (the Department) obtained a protective warrant and took minors into protective custody. On January 31, 2011, the Department filed a dependency petition alleging that due to Mother's substance abuse, she was unable to provide adequate supervision and care for Minors. The petition also alleged that Mother repeatedly drove under the influence with Minors in the car; failed to ensure that J.Z. and F.A. arrived at school on time and

attended school consistently; and exposed Minors to L.H.'s domestic violence against her.[2]

Minors were detained and placed in a foster home. In its report prepared for the jurisdiction and disposition hearing on March 2, 2011, the Department recommended that Minors be declared dependents and removed from Mother's custody, and that she be provided reunification services. At the hearing, Mother requested a settlement conference, and the hearing was continued. On March 23, 2011, Mother submitted on the Department's recommendation, which the juvenile court adopted.

At a review hearing on June 23, 2011, the Department's social worker reported that Minors had been placed together in a foster home, and had adapted very well. Mother was visiting with minors and receiving therapy and parent education. She was still using methamphetamine, however, and had been accepted into a residential treatment program, Casa Teresa, where she had been for four days. She was also pregnant. At the hearing, the juvenile court judge admonished Mother that she needed to complete the Casa Teresa program successfully, and to make changes in her life, if she wanted her children to remain part of her life.

In its report for the six-month review hearing on September 22, 2011 (the September 2011 report), the Department recommended that services be terminated and that the juvenile court set a permanency planning hearing under Welfare and Institutions Code section 366.26[3] (.26 hearing). Mother was still using methamphetamine despite her pregnancy, and the drug treatment services she had been given; was in denial about her drug use; and had left the Casa Teresa program a few days after her admission in June 2011. Mother missed nine of her drug tests, and tested positive four times, with one dilute test in addition. She admitted at the hearing that if she were drug tested that day, the result would be positive for methamphetamine. Mother was participating in a relapse

---

[2] J.C. also committed domestic violence against Mother, to which J.Z., at least, was exposed.

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

prevention group, and making some progress, but the Department social worker believed that Mother still had not addressed her substance abuse issues.

In addition, Mother missed a few of her visits with Minors, and had not completed her parenting education services. She had been inconsistent in attending therapy, and in May 2011, she had been involved in another domestic violence incident with her new boyfriend, which resulted in her hospitalization.

In the September 2011 report, the Department stated that the two older boys were healthy, behaved normally for their age, and were generally doing well. The youngest, E.S., was physically healthy, but had some developmental delays, particularly in regard to his speech. He had been referred for speech therapy, and was expected to start receiving it once the school year began. Minors had been accepted for adoptions planning by the California Department of Social Services (CDSS), and two paternal aunts of the older boys had expressed interest in caring for them; one of the aunts was willing to care for E.S. as well.

The six-month review hearing set for September 22, 2011, was continued to October 12, 2011, at Mother's request, so that a settlement conference could be held. On the continued hearing date, Mother was not present. Her counsel reported that Mother was planning to return to Casa Teresa, and submitted on the Department's report. At the conclusion of the hearing, the juvenile court entered an order (the October 2011 order) finding that Mother had failed to participate regularly and to make progress in her court-ordered treatment programs and services. The October 2011 order terminated Mother's reunification services, and set a .26 hearing in February 2012 to consider a permanent plan.[4] Mother did not seek writ review of the October 2011 order.

Between October 2011 and February 2012, Minors remained in the same foster home where they had been placed in January 2011, and continued to visit Mother once a

---

[4] The .26 hearing was originally set for February 9, 2012, but was continued to February 16, 2012, at the request of Minors' counsel.

week.  Mother remained at the Casa Teresa inpatient drug treatment program, and on December 31, 2011, Mother gave birth to her fourth child (another son), F.Z.[5]

The Department filed its report for the .26 hearing (the January 2012 report) on January 27, 2012.  At that point, Minors' proposed permanent plan was adoption by Mother's uncle (Uncle) and his wife (Aunt) (that is, Minors' great-aunt and great-uncle), who were in their mid-50's, without terminating Mother's parental rights.  Minors were starting to visit with Aunt and Uncle, but had not yet developed a solid relationship with them.  Moreover, the assessment of Aunt and Uncle's suitability as adoptive parents had not been completed.  Mother, Minors' counsel, and the Department therefore agreed, at the hearing on February 16, 2012, to continue the .26 hearing for 120 days to give Minors more time to transition from their foster home and to develop a stronger bond with Aunt and Uncle.  The juvenile court continued the .26 hearing to June 14, 2012.

Between February and June 2012, Minors remained in the same foster home where they had been all along, continued to be in good health, and were reported by their foster mother to be "well-adjusted children who present no behavioral challenges."  E.S. still had developmental delays, including severe speech issues, but he was receiving speech therapy, his speech had improved, and he was "a delightful child."  Minors continued to have supervised visitation with Mother, but the visits were reduced in May 2012 from weekly to bimonthly, and the Department planned to reduce them to once a month.  Minors only had contact with their half-brother F.Z. during their visits with Mother.

On June 11, 2012, the Department filed its report (the June 2012 report) for the June 14, 2012 hearing.  In the June 2012 report, CDSS reported that "despite deep caring for the boys, and months to resolve their ambivalence," Aunt and Uncle had decided they were "unable to care for all three boys," especially given E.S.'s young age.  Minors had a good relationship with J.Z. and F.A.'s paternal relatives in another county, and J.Z. and F.A. expressed interest in going to live with them, but these relatives had been "ruled out

---

[5]  F.Z. is not a subject of the dependency proceedings underlying this appeal.

5

as a placement option some time ago." The boys were quite attached to one another, and had lived together all their lives. Therefore, both the Department and CDSS recommended that Mother's parental rights be terminated, and that adoption be selected as Minors' permanent plan.

CDSS had already identified one potential adoptive home that was willing to accept all three Minors, but the potential adoptive parents and Minors had not yet met. A search for additional possible adoptive placements was still in progress, and CDSS was confident that in time, it could locate a suitable family. CDSS was beginning to prepare Minors for "a slow transition to the care of the potential adoptive family." CDSS believed the transition could "be designed with relatively minimal detriment, given [Minors'] resilience, optimism, [and] connection to one another," along with their current foster mother's "helpful skills." CDSS opined that although Minors derived "some incidental benefit" from their interaction with Mother, it did not "outweigh the benefit [Minors would] gain through the permanence of adoption," and "termination of [Mother's] parental rights would not be detrimental" to Minors. CDSS had informed the potential adoptive parents that they could agree to continuing post-adoption contact between Minors and Minors' biological relatives, including Mother, but further discussion would be needed to determine whether such an agreement would be appropriate and in Minors' best interest.

As of the date of the June 2012 report, Mother was on a court-ordered plan of family maintenance with F.Z. She was scheduled to be discharged from Casa Teresa that day. However, she had not yet located suitable housing for herself and the baby. On the date of the .26 hearing, she requested a settlement conference and a contested hearing, and the matter was continued for that purpose.

On August 1, 2012, Mother filed three petitions to modify court order, one for each Minor (collectively, the JV-180[6]). The JV-180 asked that Minors be returned to

---

[6] The petitions were filed under section 388. A petition filed under that section is commonly referred to as a JV-180, after the designation of the Judicial Council form used to file the petition.

Mother's custody under a family maintenance plan, based on changed circumstances that included Mother's completion of the Casa Teresa program and her regular attendance at substance abuse recovery groups; her current sobriety and increased insight into domestic violence issues; and the Department's decision not to try to remove F.Z. from her custody. Due to the filing of the JV-180, the matter was continued to August 30, 2012, and then again to September 20, 2012, for a combined contested hearing on the JV-180 and contested .26 hearing.

At the hearing on September 20, 2012 (the September 2012 hearing), Mother called as a witness Ms. Castaneda-Martinez, the social worker who was supervising Mother's family maintenance plan with her youngest child, F.Z. Castaneda-Martinez testified that Mother had graduated from the Casa Teresa program on or about June 10, 2012, but had remained housed at Casa Teresa until she was able to locate suitable housing. Mother was now renting a room in a two-bedroom apartment, which Castaneda-Martinez acknowledged would not be large enough to accommodate Minors as well as Mother and the baby. Mother testified that she was looking for a two-bedroom or larger apartment, in which Minors could at least share their own bedroom as they had done in the past, or possibly each have their own room.

Castaneda-Martinez reported that Mother was employed; was attending recovery meetings; was randomly drug testing and had tested clean on her most recent test; was participating in in-home parenting education; and was in compliance with all aspects of her family maintenance plan except the requirement for individual psychotherapy. Mother had missed two appointments with the therapist first assigned to her, and Castaneda-Martinez was in the process of locating another Spanish-speaking therapist. Mother explained that she had missed the appointments because of scheduling conflicts, and had not been able to reach the therapist because she had not been given her phone number. The Department was not contemplating removing F.Z. from Mother's custody.

Castaneda-Martinez acknowledged, however, that Mother was still in the early stages of recovery, and opined that substance abusers have the most risk of relapsing when they have just left a residential treatment program. Although Mother was doing

7

well, there was still some risk she could relapse. Moreover, Mother was working long hours, during which F.Z. was in day care, and Castaneda-Martinez was concerned that given Mother's schedule, it would be very challenging for Mother to manage caring for Minors in addition to F.Z.

Mother testified in support of the JV-180 that if Minors were returned to her custody, her family would support and help her. Mother said she had been "sober" for a year; was attending three recovery meetings a week; and had been able to handle her grandfather's recent death without relapsing. Mother also explained that the Casa Teresa program was longer, and included more support and more relapse prevention education, than the residential treatment program she had attended voluntarily in 2009.

Mother acknowledged that all three of her children's fathers had abused her, and that Minors had been harmed by their exposure to her abuse by E.S.'s father. Domestic violence treatment had not been included in Mother's family maintenance plan, because she did not currently have a partner. However, Mother testified that she had voluntarily attended a 16-week domestic violence program, independently of the Department. The class included information about the effect on children of witnessing domestic violence.

Mother testified that Minors kissed her during their visits, called her "momma," and wanted to return to her custody. Mother's counsel noted that Mother's visitation with Minors had been regular and consistent.

Minors' counsel opposed the JV-180, and argued in favor of termination of Mother's parental rights. Counsel argued that Mother had not consistently taken a parental role with Minors, noting that even prior to Minors' removal from Mother's custody, J.Z. and F.A. had often been forced to take care of their little brother E.S. The Department's counsel also argued in favor of termination of Mother's parental rights, noting that Minors had already been in a temporary placement for almost two years, and that this impermanence would be prolonged if they were not freed for adoption, because even if Mother retained her parental rights, Minors could not return to her custody immediately.

8

The juvenile court denied the JV-180, finding that continued efforts at reunification would not be in Minors' best interest. With respect to the .26 hearing, the court found there was insufficient evidence of exceptional circumstances on which to base a finding that termination of Mother's parental rights would be against Minors' best interests. Therefore, based on the statutory preference for a permanent plan of adoption, the court terminated Mother's parental rights. Mother timely appealed.

## DISCUSSION

### A. Denial of Petition to Modify Order

Under section 388, a parent may petition to modify a previously issued court order in a dependency proceeding on the basis of changed circumstances or new evidence. The parent must also demonstrate that the requested modification would be in the best interests of the dependent child. The party seeking the modification bears the burden to prove both of those requirements by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1); see also *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

In the present case, Mother's JV-180 was not filed until after her reunification services had been terminated. "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement [i.e., a JV-180] at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Accordingly, after reunification services are terminated, "[i]n order to revive the reunification issue, the parent must prove changed circumstances pursuant to section 388. [Citations.]" (*In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1800.) Thus, in the present case, Mother was not entitled to a further opportunity to reunify with Minors unless she persuaded the juvenile court to grant her JV-180.

9

As Mother acknowledges, we review a juvenile court's order granting or denying a JV–180 for abuse of discretion. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358; *In re Michael B.*, *supra*, 8 Cal.App.4th at p. 1704.) We may not substitute our own judgment for that of the juvenile court; reversal is warranted only when the juvenile court "exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re A.S.*, *supra*, 180 Cal.App.4th at p. 358.) "The denial of a section 388 motion rarely merits reversal as an abuse of discretion. [Citation.]" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

More specifically, it is not an abuse of discretion to deny a section 388 petition that "alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point," because granting such a petition "does not promote stability for the child or the child's best interests. [Citation.] ' "[C]hildhood does not wait for the parent to become adequate." ' [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

In the present case, in support of her contention that the juvenile court abused its discretion in denying her JV-180, Mother relies extensively on *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*). *Kimberly F.* is readily distinguishable, however.

*Kimberly F.*, *supra*, 56 Cal.App.4th 519, involved a single mother with four children who permitted her home to become filthy and unsanitary because she was overwhelmed by the needs of her oldest child, a teenager who had a life-threatening illness. As a result, her two youngest children were removed from her care. The mother ultimately managed to remedy the conditions in the home that had led to the younger children's removal, but this did not occur until after the termination of reunification services. Accordingly, the mother filed a petition under section 388 shortly before the permanency planning hearing, but the juvenile court denied it.

On the mother's appeal, the court concluded that although "[i]t is rare that the denial of a section 388 motion merits reversal as an abuse of discretion, . . . this is such a case." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 522.) In so holding, the court stressed

10

that a court considering a JV-180 "must consider the seriousness of the reason for the dependency in the first place. Not all reasons for initial dependency jurisdiction are equal from the point of view of a child's interests." (*Id.* at p. 530.) In *Kimberly F.*, the original reason for the children's removal from their mother's home—its unsanitary condition— was the *least* serious of the circumstances that can justify intervention by the dependency system, and one of the most easily remedied. (See *id.* at pp. 522, 532.) The *Kimberly F.* court expressly distinguished cases such as the one now before us, in which the original reason for removal is drug addiction or substance abuse.

Meanwhile, the mother in *Kimberly F.* had had "a substantial amount of unmonitored visitation during the period of dependency," and there was an "undisputedly strong bond" between the children and their mother—"a bond which [was] strong enough . . . to vitiate the children's desire to be adopted by their caretakers." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) The children were also strongly bonded to their two older brothers, who had remained in the mother's care. (*Ibid.*) For all of those reasons, the court concluded that the denial of the mother's section 388 petition was an abuse of discretion.

None of the factors on which the court relied in *Kimberly F.* is present in this case. Substance abuse is a far more serious and intractable problem than a dirty house, and requires a correspondingly more extensive showing of *lasting* remediation before the parent can convincingly contend that the conditions justifying removal have been permanently eliminated. The *Kimberly F.* court expressly recognized this distinction. (See *Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, fn. 9.) In the present case, by the time of the September 2012 hearing, Mother had less than a three-month track record of maintaining her sobriety *outside* the context of a residential treatment program, and the social worker whom Mother called as a witness acknowledged that Mother was still in the early stages of recovery, when she was at greatest risk of a relapse.

In addition, in the present case, Mother's showing regarding Minors' bond with her is far weaker than the showing made by the mother in *Kimberly F.*, *supra*, 56 Cal.App.4th 519. We do not discount the evidence that Minors recognized Mother as

11

their mother, had affection for her, and enjoyed seeing her. J.Z., at least, had expressed a desire to continue visiting with her. On the other hand, during the entire course of the dependency proceedings, Mother never had more than brief, supervised visits with Minors, which occurred twice a week at most, and were later reduced to weekly and then every other week. Despite this separation from Mother, Minors flourished in their foster mother's care, and never expressed a desire to return to living with Mother. Accordingly, Mother has not persuaded us that the evidence of Minors' bond with her was so strong as to render it an abuse of discretion to deny the JV-180.

Finally, unlike the younger children in *Kimberly F.*, Minors do not have a strong bond with their sibling who has remained in Mother's care.[7] Minors were removed from Mother's custody before their baby half-brother was born, and have seen him only during their brief visits with Mother, which have occurred twice weekly at most. We recognize that Minors wished to remain in contact with their extended family, including Aunt and Uncle, but this does not outweigh their need for the permanence and security that Mother was not prepared to offer them. For all of the foregoing reasons, and notwithstanding the result in *Kimberly F.*, we are not persuaded that the juvenile court abused its discretion in the present case.

## B. Adoptability

In her opening brief on appeal, Mother argued that the trial court's finding that Minors are adoptable is not supported by substantial evidence. In its respondent's brief, the Department pointed out that Mother, through her counsel, affirmatively stipulated at a juvenile court hearing on August 30 that Minors are adoptable. Accordingly, the Department argued that Mother either waived the issue, or is estopped from raising it on appeal.

In her reply brief, Mother conceded that she waived her right to raise this issue on appeal. Accordingly, we affirm the juvenile court's finding that Minors are adoptable.

---

[7] It is clear from the record that Minors have a strong bond with each other, but it is equally clear that the Department recognized that fact, and was not prepared to approve a permanent placement that could not accommodate all three of the boys together.

## C. Termination of Parental Rights

At a section 366.26 hearing, when reunification services have been terminated and adoption is likely, parental rights must be terminated unless the objecting parent satisfies the burden of proving that termination of parental rights would be detrimental to the minors under one of the exceptions listed in section 366.26, subdivision (c). (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.) Mother asserted in the juvenile court, and reiterates on appeal, that her parental rights should not have been terminated because the statutory beneficial relationship exception applies. (§ 366.26, subd. (c)(1)(B)(1) [parental rights not to be terminated when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship"].)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must show he or she occupies a "parental role" in the child's life (*ibid*.), resulting in " 'a significant, positive, emotional attachment from child to parent.' [Citation.]" (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

There is some dispute in the case law regarding the correct standard of review on appeal from an order rejecting the applicability of the beneficial relationship exception to the termination of parental rights. "Most courts have applied the substantial evidence standard of review to this determination [citations], although at least one court has concluded that it is properly reviewed for an abuse of discretion [citation]." (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) The Sixth District has adopted a hybrid standard, under which the determination whether a parental relationship exists is reviewed under the substantial evidence test, whereas the abuse of discretion standard applies to the determination whether that relationship is sufficiently important that the detriment from its termination would outweigh the benefit of adoption. (*In re Bailey J.* (2010) 189

13

Cal.App.4th 1308, 1314-1315; accord, *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622.)

As pointed out in *In re Jasmine D.*, *supra*, 78 Cal.App.4th at page 1351, "[t]he practical differences between the [various] standards of review are not significant" in reviewing a juvenile court's conclusion that the beneficial relationship exception does not apply. In any event, we need not resolve this issue in the present case, because regardless of the standard of review we apply, we find insufficient reasons to overturn the juvenile court's decision.

The Department disputes that Mother "maintained regular visitation and contact" with Minors, as required by the statute. (§ 366.26, subd. (c)(1)(B)(1).) Mother argues that she did, and the record arguably supports her position. We need not decide, however, whether Mother has met this prong of the statutory test. In order for the beneficial relationship exception to apply, Mother must *also* demonstrate that her "relationship [with Minors] promotes the[ir] well-being . . . to such a degree as to outweigh the well-being [Minors] would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) In other words, the burden is on Mother to show that her parent-child relationship with Minors is such that they will be *greatly* harmed by the termination of her parental rights, so that the presumption in favor of adoption is overcome. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854.) Implicit in this standard is that "a *parental* relationship is necessary for the exception to apply, not merely a friendly or familiar one. [Citations.]" (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350, original italics.)

In support of her argument that she meets this standard, Mother points to the evidence that Minors are old enough to know her as their mother, showed affection for her, and lived with her most of their lives. These facts alone are not sufficient, however, to demonstrate that breaking the familial bond between Mother and Minors would be so detrimental to them as to outweigh the benefits of adoption. "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a

*substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466, original italics.) The evidence here is to the contrary. Minors flourished under the care of their foster mother, and nothing in the record suggests that they suffered any detriment from having their contact with Mother reduced to weekly and then bimonthly visits.

Mother relies on *In re S.B.*, *supra*, 164 Cal.App.4th 289, but the facts here are sharply distinguishable. In *In re S.B.*, the social worker and bonding study expert both opined that terminating the father's parental rights would be detrimental to the minor. The minor was unhappy when her visits with father ended; missed him when they were not together; and told him she wished she lived with him. (*Id.* at p. 298.) That record "fully support[ed] the conclusion [that father had] continued the significant parent-child relationship despite the lack of day-to-day contact with [his daughter] after she was removed from his care. [Citation.]" (*Id.* at p. 299, italics omitted.)

The record in the present case is not comparable. Here, there was no expert testimony supporting a finding of detriment to Minors from terminating Mother's parental rights. Moreover, Mother points to no evidence that Minors requested longer or more frequent visits with her, or exhibited distress or behavioral problems when separating from her at the conclusion of their visits. (Cf. *In re Zachary G.* (1999) 77 Cal.App.4th 799, 811 [even though mother maintained regular contact with minor and had a positive relationship with him, beneficial relationship exception did not apply where minor relied entirely on other caregivers to meet his physical and emotional needs, and did not appear to be upset when visits with mother ended].) Moreover, at the time of the September 2012 hearing, Mother was not yet prepared to take custody of Minors immediately; she had not yet found a place to live that was large enough to accommodate them, and she presented no evidence that she had any specific plan for how to ensure that Minors were adequately cared for during her extensive work hours.

In sum, the beneficial relationship exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing that the child would derive some benefit from continuing a relationship maintained during

15

periods of visitation with the parent." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348.) Regardless of the applicable standard of review, we find nothing in the record that would justify overturning the juvenile court's order terminating Mother's parental rights.

## DISPOSITION

The juvenile court's orders denying Mother's motion to modify and terminating Mother's parental rights are AFFIRMED.

_____
RUVOLO, P. J.

We concur:

_____
RIVERA, J.

_____
HUMES, J.