Filed 6/6/13  In re Adan R. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Adan R. et al., Persons Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>Danielle D.,<br><br>        Defendant and Appellant. | A136151<br><br>(Sonoma County<br>Super. Ct. Nos. 3013-DEP, 3014-DEP) |

Appellant Danielle D. (Mother) has a long history of child welfare referrals involving her son, Adan, and her daughter, Eden.  On December 10, 2008, the Sonoma County Human Services Department (Department) filed a juvenile dependency petition on behalf of both children pursuant to Welfare and Institutions Code section 300.[1]  In November 2011, the juvenile court terminated Mother's reunification services, and set a section 366.26 hearing on termination of parental rights.  Mother filed petitions under section 388 seeking to reinstate services and prevent termination of her parental rights based on the alleged strength of her parental bond with her children.  At Mother's request, a bonding study was conducted.  The evaluator concluded that the children no longer looked to Mother for security and stability and that they looked forward to

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

adoption by their paternal grandmother. The court denied the section 388 petitions and terminated Mother's parental rights. We affirm.

## I. BACKGROUND

Mother was the subject of multiple child welfare referrals involving Adan (born in 2002) and Eden (born in 2004), and had a history of substance abuse and domestic violence.[2] In 2005, the children's father, Michael R. (Father) was arrested three times for battery on Mother and convicted in one of the incidents. (Pen. Code, § 273.5, subd. (a).) In August 2006, Adan exhibited sexualized behavior and disclosed that his seven-year-old uncle had engaged in sexual activity with him, he had observed his parents engage in sexual activity, and he had observed a domestic altercation between his parents. In October 2007, Mother was arrested for possession of drugs and drug paraphernalia. (Health & Saf. Code, §§ 11377, subd. (a), former 11364.)

In January 2008, Mother and the children were found living in a home with no heat or electricity and the children were hungry and cold. Based on a referral from University of California police, a report prepared at the time of the incident stated that Mother "is a known methamphetamine user. . . . She has confrontations physical and verbal with other meth users while in [People's Park in Berkeley]." The children were taken into protective custody temporarily but were returned home with no dependency case initiated. In May 2008, another domestic violence incident occurred between Mother and Father, and Father was arrested for domestic violence and a violation of probation. (Pen. Code, §§ 273.5, former 1203.2.) Mother had alcohol on her breath at the time of the incident. In June 2008, Mother was found with an adult male, Eric W., who had broken Mother's jaw in a prior domestic violence incident and was under an order to stay away from her. In September 2008, the family home was found to be filthy

---

[2] As a child, Mother was herself the subject of several child welfare referrals between 1993 and 1997. "These reports alleged that [she] was a victim of physical abuse by her mother and stepfather, had threatened to kill herself at age 10, was forced to sleep outside as a punishment, was sexually abused by the mother's boyfriend, and had been left unattended while her mother was on vacation."

and without edible food: "The floor of the residence was littered with dirt and food which had turned to mold. The refrigerator was smeared in old rotten food and was also moldy." An adult male, D.W., was living with Mother and the children and three lines of methamphetamine were laid out on a glass surface in his bedroom. Two glass marijuana pipes were located on the nightstand next to a bed where Mother slept with the children. Mother was arrested for child endangerment (Pen. Code, § 273a, subd. (a)) based on the "extremely dirty" condition of her home and the presence of illegal drugs within the reach of the children. D.W. was arrested for drug possession and child endangerment. The children were placed with the maternal grandmother but apparently returned shortly thereafter.

A. *Removal Leading to Current Dependency Case*

On December 8, 2008, the home was again found to be filthy: "knives within reach of the 4 year old; spoiled food in a dirty kitchen; a filthy refrigerator with mold present; a lack of clean clothes for the children. . . . The [four-year old] was barefoot and had a fairly recent cut on her foot which she said was [caused by] a piece of glass on the floor. There were empty beer bottles strewn all throughout the home." The bottoms of at least one child's feet were black with dirt. D.W. "was present and interfered with the deputies' investigation. The mother was uncooperative with the responding deputies and told a number of lies ranging [from] her not being on probation to the vacuum cleaner not working when in fact it did. The mother also reported that [D.W.] was in the home because he has a court date tomorrow, while the male and the children reported he was a frequent visitor to the home." The children were taken into protective custody and Mother was arrested for child endangerment (Pen. Code, § 273a, subd. (a)). D.W. was arrested for interfering with the investigation. Another man also found in the home was arrested on outstanding warrants.

B. *Jurisdiction and Disposition*

On December 10, 2008, the Department filed a juvenile dependency petition on behalf of Adan and Eden pursuant to section 300. Under section 300, subdivision (b), the petition alleged that Mother failed to provide the children with adequate food, clothing,

shelter or medical treatment and was unable to provide regular care for the children due to substance abuse. Under section 300, subdivisions (b) and (c), the petition alleged that Mother and Father had a history of domestic violence that exposed the children to a substantial risk of physical and emotional harm.[3] Mother submitted on detention.

At a January 2009 jurisdiction and disposition hearing, Mother submitted on the Department's recommendation. The court sustained the petition as amended, ordered the children removed, and granted reunification services to both parents.

C.  *Six Month Review*

Although Mother initially minimized the allegations of the petition, during the reunification period she cooperated with a psychological evaluation, obtained psychiatric medication, started therapy, and completed two parenting classes. After an April 2009 arrest and incarceration for public intoxication, she acknowledged a possible substance abuse problem and, in June, enrolled in an inpatient drug treatment program. The children had "a very close relationship with both of their parents and each other," although they exhibited mild aggression when Mother missed a visit (about once or twice a month). Mother was positive and appropriate during the visits.

At the June 2009 six-month review hearing, the court maintained the children in their foster home and authorized the Department to arrange a home visit before the next review hearing.

D.  *Twelve-Month Review*

Mother completed her inpatient alcohol abuse treatment program, participated in an aftercare program, tested negative for drugs, and worked with a 12-step sponsor. She started therapy and appeared to be taking her psychiatric medication regularly. She also started working. Both children wanted to reunite with Mother, with whom they had a particular bond. However, if adoption became necessary, the paternal grandmother was

---

[3] The petition also alleged under section 300, subdivision (g) that Mother was unable to provide for the children due to her incarceration. Because Mother had been released from custody before the jurisdiction hearing, this allegation was stricken before the petition was sustained.

willing to adopt and her home in Washington state had been approved for placement. After successful overnight visits, the children were placed with Mother on a trial home visit in November 2009.

At the 12-month review hearing in December 2009, the court granted Mother an additional six months of reunification services and scheduled a status review hearing for February 2010.[4]

E.     *Children's Return to Mother*

Mother continued to participate in therapy and attend Alcoholics Anonymous (A.A.) meetings. She obtained housing for herself and her children and regularly brought the children to school and to their therapy appointments. Adan seemed more relaxed and comfortable back in his mother's care and he acted more settled in therapy. Eden also seemed happy to be back with Mother, although her temper tantrums and aggressive behavior continued. At a March 2010 status review hearing, the court formally returned the children to Mother's care and granted Mother six months of family maintenance services.

F.     *Six Month Family Maintenance Review*

In May 2010, Eric W. came to Mother's home uninvited and intoxicated, stole money from Mother, tried to get her to drink vodka, threatened to kill her, punched her in the head, dragged her by the hair, and choked her to the point of her almost losing consciousness. Mother was able to get someone to take the children out of the home and call the police, and she cooperated with the police investigation and obtained a restraining order against Eric W.

In July 2010, the social worker made an unannounced visit to Mother's home in response to a child welfare report and found Mother with a man who had a known substance abuse problem and a criminal history. Mother did not show signs of intoxication, there were no alcohol containers in the home, and Mother tested negative

_____

[4] Father's services were terminated.

5

for drugs or alcohol. Mother was referred to a domestic violence education and psychotherapy group for services.

In other respects, the children's stay in Mother's care was going well. The children were happy and comfortable living with Mother and were doing well developmentally. Mother had received in-home parenting education and the social worker reported that the home was usually very organized, clean and stocked with food, clothing and appropriate toys for the children. She continued to test negative and participate in A.A. and other substance abuse services.

At a September 2010 hearing, the court extended Mother's family maintenance services for an additional six months.

G.     *12-Month Family Maintenance Review*

In January 2011, Mother gave birth to a baby girl, Elise, whose father was Eric W. Eric W. was still incarcerated for his May 2010 assault on Mother and was scheduled to be released in June. Mother insisted she was not interested in resuming the relationship, but she wanted Eric to have a relationship with his daughter if he changed his lifestyle.

Also in January 2011, Mother allowed Father to stay overnight in her apartment, and Father verbally and physically assaulted Mother while she was in bed with Eden. After a police investigation, no criminal action was taken against Father. Mother agreed to limit her contact with Father, participate in a domestic violence group and return to individual therapy. Mother had been to therapy only once between March 19, 2010, and February 10, 2011.

The social worker wrote that Mother "continues to struggle with issues around relationships, particularly with men, and setting boundaries. . . . [Her] co-dependency continues to compromise her ability to make healthy decisions. . . . [¶] Fortunately, [Mother] recognizes her co-dependency and is willing to address it in therapy and in a domestic violence psychotherapy group. . . . [¶] The [social worker] is thoroughly impressed with [Mother's] ability to stay clean and sober for eighteen months and her continued participation in the Twelve-Step program. . . . [¶] . . . [T]here is undoubtedly a strong connection between [Mother and her children]. [Mother] supports any activity

6

that will promote the social and emotional growth of her children and treats her children with the utmost respect."

At a March 2011 status review hearing, the court granted Mother an additional six months of family maintenance services. During the hearing, the court questioned Mother about how she would handle Eric W.'s possible demands to see his child when he was released from custody. Mother felt uncomfortable answering in the presence of Father, who was at the hearing. The court expressed concern and urged Mother to have a plan in place.

H.    *Supplemental Petition and Removal*

In July 2011, Mother allowed Eric W. into her home following his release from prison, despite the existence of a restraining order against him. He was reincarcerated for violating the restraining order and was scheduled to be released again in six months.

The Department received several reports from a neighbor that Mother was not supervising the children, was living with a dangerous-looking man, and was not maintaining the apartment. When the social worker conducted an unannounced visit, the door to Mother's apartment was wide open, the apartment was empty, and the home was filthy with trash and food on the floors. A second unannounced visit a day later found the children in the care of Jason J., a parolee with an outstanding arrest warrant who appeared to be under the influence of a drug, possibly methamphetamine. Mother defended her decision to leave the children with Jason, saying he was great with kids. She acknowledged he might have had alcohol and marijuana in his system, but claimed she did not know he was on parole.

On August 11, 12 and 15, 2011, Mother missed drug tests. On August 15, she was found walking with her three children and Jason J., who had alcohol on his breath and initially fled when he saw police. Mother also smelled of alcohol and had a backpack that contained a partially consumed 40-ounce beer.

On August 19, 2011, Mother was pulled over for failing to stop at a stop sign. The officer discovered that Mother was driving with a suspended license and without insurance, and the inside of her car was filthy, foul-smelling and unsafe. All three

children were in the car. Mother was arrested for felony child endangerment and violation of probation, and the children were taken into protective custody.

On August 24, 2011, the Department filed a supplemental petition on behalf of Adan and Eden pursuant to section 387.[5] The petition alleged Mother's substance abuse relapse, the circumstances of her August 19, 2011 arrest, and the May 2010 domestic violence incident involving Eric W. On August 25, 2011, the court ordered the children detained in the home of their maternal grandmother.

Mother minimized the allegations of the new petition. She said she failed to test twice in August 2011 because her car broke down and the third incident was a date mixup; she denied being intoxicated on August 15; and she said the charges from the August 19 incident were absurd and had been dropped.

The Department recommended removal and termination of services for Mother.[6] The Department wrote that it had not recommended removal earlier in 2011 because the children appeared to be very resilient and were bonded with Mother, who had many strengths as a parent. "But love and ingenuity are not enough to protect children. [Mother's] long history of domestic violence and addiction has undoubtedly scarred her children and the Department can no longer stand by and allow it to happen." When asked about his recent removal, Adan told the social worker, "It hasn't been that long of a time since we've been away from home so it's not that bad," although the social worker said he had a "heavy heart." Because the children needed to be removed, services also had to be terminated because Mother had exhausted the maximum amount of reunification services that could be provided.

At a November 2011 hearing, the court was informed that Mother and the Department reached a settlement regarding the supplemental petition: Mother would not contest termination of services, weekly visitation would continue. Mother requested, and the Department indicated it would not oppose, a bonding study to determine whether the

_____

[5] A petition was also filed on behalf of Elise.

[6] The report also recommended a bypass of services in Elise's case.

8

bond between Mother and her children outweighed the benefits to the children of permanency through adoption. Minors' counsel objected to the bonding study. Pursuant to local rule of court, the court required that a written motion for a bonding study be filed. The court then removed the children, terminated Mother's services, and set a section 366.26 hearing on termination of parental rights for March 29, 2012. Mother filed a writ petition challenging the section 366.26 setting, which this court denied on the merits. (*D.D. v. Superior Court* (A134645 May 21, 2012) [nonpub. order].)

I.      *Motion for Bonding Study and Section 366.26 Report*

In December 2011, Mother filed a written motion for a bonding study. A hearing on the motion was continued several times and was ultimately scheduled to be heard at the same time as the section 366.26 hearing. Explaining the postponements, the Department told the court it was pursuing approval of the paternal grandmother's home for placement and was considering a guardianship arrangement that would render the motion moot.

In its March 2012 section 366.26 report, however, the Department recommended termination of parental rights and adoption as the permanent plan. All three children were then living together in a foster home and Adan "had voiced concerns about being separated from Elise." The foster parents were willing to adopt all three children, but the paternal grandmother was willing to adopt only Adan and Eden. Nevertheless, the Department determined that the best placement of Adan and Eden was with the paternal grandmother. After being told they could not be returned to Mother's care, Eden (then seven years old) "was very clear in her desire to be placed with her paternal grandmother . . . , even if it required being separated from her siblings. . . . [¶] Adan[, then 10 years old,] also expressed his first choice . . . to be placed with the paternal grandmother[,] . . . [although he] expressed concern and sadness about being separated from Elise . . . ." The children's therapist confirmed that the children felt safe and secure with the paternal grandmother, who had provided them with their most consistent family relationship. The children had a "positive and trusting relationship" and "strong emotional ties" to her. The adoption specialist concluded that placing the children with the paternal grandmother

9

would result in minimal disruption to their lives, and the benefits of maintaining the mother-child bond or the three-sibling group did not outweigh the benefit of permanence through adoption by the paternal grandmother. The paternal grandmother had "expressed a strong desire to help the children maintain a connection with the birth parents and their half-sibling, provided these connections are in the best interests of the children."

At the March 29, 2012 hearing, the Department opposed Mother's request for a bonding study. At a May hearing, following a further settlement conference, Mother argued the court should either grant the bonding study or allow her to withdraw her submission on the supplemental petition. The court granted the request for a bonding study, relying in part on the record of the November 2011 hearing.

J.       *Bonding Study*

In July 2012, Dr. Denise L. Wagner issued a bonding study, which was based on the dependency case file, letters of support submitted by Mother, observations of three consecutive weekly visits between Mother and the children, and interviews with Mother, the children, the foster parent and the paternal grandmother.

Dr. Wagner wrote that the children repeatedly demonstrated anger and aggression toward Mother during the visits: Eden shouted to Mother, " 'You are going to kill us' "; she punched Mother and pulled hard on Mother's hair; she said she was going to put nails in a peach she gave to Mother to eat; and she deliberately passed gas in Mother's face. Adan wrote "L" and "S" for "loser" and "stupid" on Mother's forehead and sang a song with the lyric, "Kill your mother," acknowledging it was mean to her. The children did not have trouble separating from Mother at the end of visits. Mother mostly ignored the children's hostility during the visits and attempted to redirect their attention, often by talking about herself.

Dr. Wagner wrote: "Clearly, this is a complicated family with complex interpersonal dynamics. [Mother] makes good efforts to parent her children in a positive manner. . . . She nurtures [them] by bringing them healthy snacks including foods she has known them to enjoy. On the other hand, [she] has difficulty consistently being attuned to the children's emotional state. Her own emotional state appears to dominate their

10

interactions.  She enters visits in a frenzy, continually late, and exuberantly describing recent developments in her own life, seemingly without consideration of the relevance of her commentary to her children or the [e]ffect it may have on them. . . . [¶] The children each in their own way are very angry with their mother. . . . [Eden] is continually oppositional and challenging, continuing to reject her mother's bids for closeness . . . much of the time, yet at other times initiating and accepting affection from her mother. . . . She is verbally aggressive with her brother and sabotages any possibility of him engaging with their mother. [¶] [Adan] . . . has to fight for most any sustained attention from [Mother]. . . . He is mostly positioned off to the side, in the background much of the time during visits.  He deliberately says mean and cruel things to [Mother] without any visible remorse.  He shows no ambivalence when he answers [Mother's] inquiry about whether it is true that he and his sister are going to move to his grandmother's by flatly answering 'Yep.' ''

The foster mother reported that neither Adan nor Eden ever said he or she missed Mother.  However, they were " 'over the moon' when their grandmother came to visit recently and had been anxious about whether they were going to live with her or not.  They both talk[ed] with her by phone twice weekly and [were] typically engaged in conversation for 30–45 minutes each. [¶] In regard to their relationships with their younger half-sister, . . . 'they love her but they don't play with her a lot.' ''  The foster mother was committed to maintaining the sibling relationship through Skype and phone conversations and visits.

The paternal grandmother reported that when she lived in California (before her move to Washington), Adan, Eden and their parents lived with her for one year and the children lived with her for about 11 months in 2007 and for six weeks in the summer of 2008.  She had seen them about three times a year since then and she had spoken to them once a week (and more recently twice a week) since they had been in foster care.  If she adopted the children, she was committed to allowing continuing contact with Mother subject to appropriate structure.

When Dr. Wagner asked Adan how he felt about living with his paternal grandmother, he said he would " 'like it a lot' " and he spontaneously showed Dr. Wagner books of photographs taken during his visits with the grandmother. He said, " 'I know I would not see my mom; maybe once a year. It would be rough at first, but I could deal with it.' " Eden said she understood she and Adan were not going to live with Mother because " '[s]he and my dad were always fighting. My mom can't take very good care of us.' " She said she felt good about living with her paternal grandmother: " 'I still want to move to Grandma's even if I don't see mom that much,' " and even if she only visited with her younger sister occasionally.

Dr. Wagner concluded the children "have learned that they cannot rely on [Mother] for day to day protection, or for a stable, predictable life." The relationship between Mother and Adan was "one of a mother who loves her child and a son who has experienced too much pain and disappointment to be able to rely on his parent." The relationship between Mother and Eden "most resembles that of a child care provider who is attempting to manage a young child."

K.      *Section 388 Petitions*

On July 9, 2012, Mother filed two nearly identical section 388 petitions (one for each child) seeking cancellation of the section 366.26 hearing, return of the children to her care (or, in the alternative, increased visitation), and additional services. As changed circumstances, Mother cited her return to therapy in recent weeks, her cooperation with the prosecution of Eric W. in 2012, her avoidance of Eric W. and Jason J.,[7] her participation in a domestic violence program, her employment, her plans to complete a paralegal program, her sobriety and participation in A.A., and her plans for stable housing that would accommodate her and her children. To demonstrate why changes to the court's orders would be in the children's best interest, she cited the strong bond

_____

[7] Regarding Eric W., Mother wrote, "I recently encountered him in Sebastopol and had a brief conversation to see if he was staying in town or not, so that I could determine whether to find another place to stay. He was taken into custody for violating the Criminal Protective Order."

12

between her and the children, her regular participation in visitation, and the benefit of keeping all of the siblings together.

In opposition to the petitions, the Department submitted two police reports. They stated that on February 9, 2012, Mother reported a January 30–31, 2012 domestic violence incident that had been perpetrated by Eric W., who had been released from custody in December 2011. Eric W. approached Mother on January 30, 2012, and asked to talk. Because she was afraid he would become violent if she refused to talk to him, she agreed and they walked away from Mother's companions. As they approached a trailer, Eric W. grabbed Mother, held a Phillips screwdriver to her throat, dragged her under a canopy where the others could not see them, and urged her to go with him to a tent where he was staying. She stalled and apparently passed out. "Her next memory was waking up in [Eric W.'s] tent." When she tried to leave the tent, he became mad and hit her hard in the stomach and chest, dragged her down by the hair, threatened to kill her, and put his hands around her throat. She begged him to let her go and he eventually released her, but also threatened that if he saw her with another man he would slit their throats. Eric W. was charged with kidnapping, false imprisonment, assault with a deadly weapon, domestic violence, and making criminal threats. On June 5, 2012, apparently the very day Eric W. was released from custody following his February 2012 arrest, an officer saw Mother walking with him at almost 11:00 p.m. The officer arrested Eric W. for violating a restraining order protecting Mother.

At a July 13, 2012 section 366.26 hearing, the court indicated that it tentatively planned to hear evidence on the section 388 petitions and on the section 366.26 issues jointly, but then gave counsel an opportunity to be heard on the issue. The Department asked the court to deny the section 388 petitions without a hearing. It argued the allegations of the petitions were vague or conclusory and thus failed to establish a prima facie case, particularly in light of the police reports the Department had submitted in opposition: "[E]ven after the Court pointed out in January [during a hearing in Elise's case] that [Mother's] continued codependence in their relationships was one of the reasons the Court had to bypass services to her[,] [s]he still is going from a group of

13

people, going to go off by herself with him to deescalate the situation. That's classic codependence. [¶] He was then incarcerated. The day he gets out of jail, we have this second police report from June 5th, 2012, where the police officer saw the two subjects, [Eric W.] and [Mother], walking eastbound together. [¶] . . . [¶] So, . . . as far as change of circumstances, there is nothing that supports that. [¶] As to . . . the best interests of the children, the Court's got the [section 366.26] report, as well as [having received into evidence] the bonding and attachment study of Dr. Wagner." Minors' counsel joined in the Department's arguments. Mother argued in rebuttal that the petitions should be liberally construed for purposes of determining whether to schedule a hearing and that her petitions met the prima facie standard.

After confirming that Mother had received and had an opportunity to review the police reports submitted by the Department, the court denied a hearing on the section 388 petitions. "[T]here has not been a material change of circumstances. The Court is most persuaded by the very recency of the 11:00 p.m. meeting with [Eric W.] that . . . is clear evidence that there's no change of circumstances here. This is the same behavior, the same pattern, that has been existent throughout this case, that the Court, frankly, cannot accept as happenstance . . . [as it] occurred on the very day he was released from jail [which] is a repeat of a circumstance that occurred when there was a release from San Quentin, within one day . . . . [¶] . . . [¶] With regard to the best interests, the Court does take into account that is has received a very recent bonding study, which identifies the best interests of the minor[s] and . . . is viewed as a scientific, independent inquiry . . . . [¶] . . . [It] indicates . . . the requested change . . . would not be in the best interests of the minor[s]."

L. *Section 366.26 Hearing*

The bonding study, which had been previously received into evidence subject to cross-examination of Dr. Wagner, was admitted at the section 366.26 hearing. Dr. Wagner, whom the court qualified as an expert witness, testified that the children "do not see their mother as someone who can provide security and safety for them." She agreed that the children had "moved on" and were looking forward to moving in with

14

their paternal grandmother: "[T]hey've accepted the circumstances as they are now, and . . . are building a good attachment, do have a good established relationship with their grandmother." On Adan's separation from Elise, she testified that "he was sad about her not coming with them, but it didn't dissuade his desire to go and live with his grandmother." Eden's attitude was similar. In sum, she opined, "I believe that severing the bond would not be a detriment that would outweigh a plan of adoption and the permanence provided there."

Mother argued the beneficial parental relationship exception precluded termination of parental rights. She argued the children's anger described in the bonding study "has come up in the last year since their removal. And I think it's as likely that it's an anger that's at the situation, rather than at mother." She noted that earlier in the dependency case, the social worker and service providers reported that Mother was a good parent and the children were bonded with her. Mother also argued that the beneficial sibling relationship exception applied. The Department argued the children's right to a stable, permanent home outweighed their interest in preserving their relationship with Mother or Elise, particularly in light of the history of three removals in four years. Minors' counsel concurred.

The court ruled that the exceptions did not apply and terminated Mother's and Father's parental rights.

## II.    DISCUSSION

A.    *Section 388 Petitions*

Mother argues the trial court erred in denying her a full evidentiary hearing on her section 388 petitions. We affirm.

A parent "may, upon grounds of change of circumstance or new evidence, petition the court . . . to change, modify, or set aside any order of court previously made . . . . [¶] . . . [¶] . . . If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held . . . ." (§ 388, subds. (a)(1), (d).) "The court may deny the petition ex parte if: [¶] . . . the petition . . . fails to state a change of circumstance or new evidence that may require a change of

15

order . . . or, that the requested modification would promote the best interest of the child." (Cal. Rules of Court, rule 5.570(d)(1) ["Denial of hearing"].)[8]  "A petition for modification must be liberally construed in favor of its sufficiency."  (Rule 5.570(a).)  If a hearing is held, the party that brings the petition bears the burden of persuasion. (Rule 5.570(h)(1).)  The juvenile court's ruling on the petition is reviewed for abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

A section 388 petition seeking reunification services after a section 366.26 hearing has been set plays a special role in the dependency scheme.  "Once reunification services are terminated, the focus shifts [from family reunification] to the needs of the child for permanency and stability. . . . The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue.  Section 388 provides [an] 'escape mechanism' . . . to allow the court to consider new information" and "to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order."  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  The section 388 petition provides the parent a means of rebutting the presumption after termination of services that a permanent plan other than reunification is in the child's best interest.  (*Id.* at p. 310.)

The trial court did not abuse its discretion in denying a full evidentiary hearing on the petitions.  The court could have denied the petition ex parte.  On the issue of changed circumstances, the petitions alleged at most *changing* circumstances, i.e., a renewal of Mother's efforts to address the problems that led to the children's dependency:  her return to therapy, her alleged avoidance of men who were substance abusers and perpetrators of domestic violence (and cooperation in Eric W.'s prosecution), her enrollment in a domestic violence counseling program, and her efforts to obtain gainful employment and stable housing.  However, "[a] petition which alleges merely *changing* circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some

_____

[8] All further rule references are to the California Rules of Court.

16

future point, does not promote stability for the child or the child's best interests. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, italics added.) The changed circumstances alleged in Mother's petitions on their face were too little and too late in the three-and-one-half-year dependency case to justify further delay in adopting a permanent plan for the children. (Cf. *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526–527 [changed circumstances existed where "home was no longer in an unsafe and unsanitary condition," where condition of home had led to the dependency].)

Mother argues the court applied an incorrect legal standard when it required a "material change of circumstances" even though the statute only requires a "change of circumstances." We disagree. Common sense dictates that the "change of circumstance" standard must include a materiality element as measured by the purpose of the statute; otherwise, the mere passage of time would suffice to reopen prior orders upon an appeal to the children's best interests. Courts recognize this implicit materiality standard by referring to "a genuine change of circumstance" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250) and a change of circumstances "which may make the modification of a prior order appropriate" (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 674) when discussing the section 388 standard.

Finally, Mother argues her due process rights were violated because "the court neither summarily denied mother's petition[s] nor did it grant mother a hearing. Instead, the court heard argument from the parties regarding mother's petition[s] before denying the petition[s] without allowing mother a full evidentiary hearing." We agree there was some ambiguity in the court's actions. The court ruled that it would "deny the hearing" on the petitions, presumably because the allegations of the petition failed to make a prima facie showing. However, in explaining its reasons, the court cited evidence: the police reports and the bonding study. The court even took pains to verify that Mother had received the opposition evidence and had had an opportunity to review it, apparently to allay any concerns that her due process rights might be violated if the court relied on the evidence. Nevertheless, even if we assume that the court in fact held a hearing on the petitions and denied them on their merits, Mother has failed to show reversible error.

17

The court was not required to conduct the hearing with live testimony, but was free to rely on the information contained in the petition, documentary evidence, and argument of counsel. (Rule 5.570(h)(2); *In re E.S.* (2011) 196 Cal.App.4th 1329, 1340; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1080–1081.) Nothing in the record suggests that the court denied the petitions because Mother did not offer evidence in support of the specific factual allegations in her petitions; rather, the court inferably concluded that those facts, if assumed to be true, were insufficient to justify a change in the court's orders. Moreover, nothing in the record suggests that Mother was denied an opportunity during the hearing to challenge the police report or bonding study evidence or to offer additional evidence (or at least make an offer of proof) in support of her petitions. Finally, she makes no showing on appeal that, had she been given an opportunity to present additional evidence or further argument on the petitions, there was a reasonable probability of a different result.

Mother has not established reversible error in the court's disposition of her section 388 petitions.

B. *Termination of Parental Rights*

Mother also challenges the court's order terminating her parental rights to Adan and Eden, arguing the court should have found that the beneficial parent and sibling relationship exceptions applied. We affirm.

At a section 366.26 hearing, the juvenile must determine by clear and convincing evidence whether it is likely the dependent minor will be adopted. (§ 366.26, subd. (c)(1).) If the court finds a likelihood of adoption, the court must terminate parental rights and order the child placed for adoption unless, as applicable here, it finds a "compelling reason" that termination would be detrimental under one of the exceptions listed in section 366.26 subdivision (c)(1)(B). A party arguing that one of those exceptions applies has the burden of producing evidence that establishes the exception. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343 [discussing former § 366.26, subd. (c)(1), predecessor of § 366.26, subd. (c)(1)(B)].) We review the trial court's decision either for substantial evidence or for abuse of discretion; in this context, there is

18

little difference between these standards of review.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351–1352.)

        1.     *Beneficial Parental Relationship Exception*

Under the beneficial parental relationship exception, the court must find a "compelling reason" that termination of parental rights would be detrimental because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  "The existence of interaction between the natural parent and child will always confer some incidental benefit to the child."  (*In re Lorenzo C., supra,* 54 Cal.App.4th at p. 1342.)  The beneficial parental relationship exception requires more, "that the parent-child relationship promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents.  [Citation.]"  (*Ibid.*)

We have no difficulty concluding that the trial court's ruling is supported by the record and was not an abuse of discretion.  The bonding study amply demonstrated that as of the relevant time—at the permanency planning stage of the dependency case following approximately three years of services and repeated removals of the children from Mother's care due to recurring domestic violence and incidents of child neglect—the children no longer looked to her for parental security and support.  On the contrary, the children looked forward to placement with a loving relative who could provide them with stability and security for the rest of their diminishing childhoods.  This bonding study, on which Mother had pinned her hopes of maintaining her parental rights, instead turned out to be devastating to Mother's case.  The children showed considerable hostility toward Mother during the observed visits and showed true enthusiasm about placement with their paternal grandmother.  While Mother accurately cites evidence that the children had maintained a positive relationship with her throughout much of the dependency case, the question before the court was whether at the time of the section 366.26 hearing the detriment of terminating the children's legal relationship with

Mother was so compelling that it outweighed the legislative preference for providing children with the permanence and stability of adoption. The bonding study, rather than the reports of Mother's visits with the children earlier in the case, was the relevant evidence on that point and unambiguously weighed in favor of adoption.

The trial court did not err in ruling that the beneficial parental relationship exception to termination of parental rights did not apply.

2.      *Beneficial Sibling Relationship Exception*

To apply the sibling relationship exception, the court must find a compelling reason for determining termination of parental rights would be detrimental to the minor because it would cause "substantial interference with a child's sibling relationship . . . as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)[9] "To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L. Y. L., supra,* 101 Cal.App.4th at p. 952, fn. omitted.) "In enacting this exception, the legislature was concerned with preserving long-standing relationships between siblings which serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.)

Again, the trial court clearly did not err in finding that the exception did not apply. The bonding study showed Adan in particular felt an attachment to his sister Elise, but his desire to live permanently with his paternal grandmother was more powerful. The children had a long-term and apparently secure family relationship with the paternal grandmother and with each other. Their relationship with Elise was shorter term and, as an infant, Elise's ability to build relationship with them was necessarily limited. While the children felt natural sadness at moving away from Elise—just as they naturally felt sadness at losing contact with their mother—the court reasonably concluded that the

---

[9] A parent has standing to raise the appellate issue of whether the sibling relationship exception should have been applied by the juvenile court. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 951.)

benefit of maintaining the relationship with Elise was not sufficiently compelling to override the legislative preference for adoption.

The court did not err in refusing to apply the beneficial sibling relationship exception to termination of parental rights.

### III.   DISPOSITION

The July 13, 2012 order terminating parental rights is affirmed.


_____
Bruiniers, J.


We concur:


_____
Simons, Acting P. J.


_____
Needham, J.