Filed 10/8/13  In re Jordan S. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JORDAN S. et al., Persons Coming Under the Juvenile Court Law. | B246849<br>(Los Angeles County<br>Super. Ct. No. CK79729) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>J.K.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Sherri Sobel, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Sherman & Associates and Kenneth P. Sherman for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Aileen Wong, Deputy County Counsel for Plaintiff and Respondent.

J.K. (mother) appeals the juvenile court order denying her Welfare and Institutions Code[1] section 388 petition, claiming the court abused its discretion in failing to return mother's three children to her care based on her changed circumstances and the children's best interests. She also appeals the subsequent order establishing legal guardianship of the children with their paternal grandparents, arguing it is not in the children's best interests. We hold the juvenile court properly denied the section 388 petition and ordered legal guardianship of the children. The orders are affirmed.

## I. FACTS AND PROCEDURAL HISTORY

On February 16, 2010, minors Jordan, born in 2004, Justin, born in 2007, and Ja., born 2009, were declared dependents of the court based on sustained allegations under section 300, subdivision (b), that they were at substantial risk of suffering serious physical harm or illness as a result of their parents' failure to adequately supervise or protect them and mother's willful failure to protect the children from the conduct of their father. The children were removed from the parents' custody and the Department of Children and Family Services (DCFS) placed them in the care of their paternal grandparents. Mother was provided reunification services and granted regular visits which were first monitored and later unmonitored.

On August 2, 2011, the juvenile court conducted a review hearing pursuant to section 366.22, at which the social worker, Jordan, mother and paternal grandfather testified. The court remarked that mother's testimony "was so removed and so aloof from any empathy, sympathy, or understanding of her children's needs from the very second of what a child needs, the most basic needs, . . . [¶] There's no – there's a disconnect between having the children and raising the children for the mother that is almost unseen in my court. She doesn't get what her kids need. When she's told what they need, she kind of fixes it for the moment. But it is enormously important to me that

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

at no time do we get anything other than a casual either 'I don't know' or 'I guess I'll talk to my therapist.'" The court found by a preponderance of the evidence that return of the children to either parent's care would create a substantial risk of detriment, terminated reunification services and scheduled a selection and implementation hearing for November 2011.

The juvenile court also indicated that, due to the children's relationship with the parents, adoption was not an option and parental rights would not be terminated. The court then ordered the DCFS to have an expert evaluate mother and the children to "gaug[e] her ability to parent these children appropriately." Of particular concern to the court was mother's inability to empathize with the children. Dr. Stephen Ambrose was ordered to conduct an Evidence Code section 730 examination. The court indicated the assessment was to be conducted without a case history provided.

Dr. Ambrose's evaluation was based on his November 2, 2011, interview with mother followed by his observation of a 45-minute visit between mother and the children. Dr. Ambrose did not find any evidence of "an empathy deficit significant enough to prevent reasonably caring and attentive parenting," nor did he have reason to believe mother's expectations for the children were not age appropriate. However, he noted: "Of greater concern to me than Ms. [K.'s ] capacity for empathy and parenting skills [is] her history of poor relationship choices and the impact of these choices on her children. She remained in a relationship for many years that resulted in her children experiencing much instability and, reportedly, at least some exposure to domestic violence. She reports that she has understood and addressed her 'severe co-dependency' but that, of course, will need to be demonstrated over time." Moreover, while Dr. Ambrose reported that mother and Ja. seemed to be developing a bond, the attachment between mother and the boys appeared "quite tenuous." The boys appeared angry and unwilling to show mother any affection.

In the December 6, 2011 section 366.26 report, the social worker reported the children had been placed with the paternal grandparents since November 4, 2009. Mother continued to have unmonitored weekend visits with the children at her home in

3

San Diego every other weekend, as she had been doing since January 2011, with mother picking up the children on Friday at 6:00 p.m. and returning them on Sunday at 6:00 p.m. Father had sporadic, monitored visits at the paternal grandparents' home.

The social worker summarized a typical day in the grandparents' home as follows. The children wake up at 6:20 a.m.; grandfather helps them get dressed and takes Jordan to school at approximately 7:45 a.m. While Jordan is at school, Justin and Ja. watch educational television programs, work on educational workbooks, color, play outside, and accompany grandfather on errands until approximately 3:00 p.m., when they pick up Jordan from school. The children eat a snack when they arrive home and play outside until their grandmother returns home from work. The family eats dinner at approximately 6:30 p.m. and the children go to bed at around 8:00 p.m.

The social worker reviewed Jordan's report card, which indicated he was progressing satisfactorily in school, having a single excused absence and no tardies during the grading period. In addition, all of the children's medical needs were being addressed and the children had no diagnosed or suspected developmental or cognitive delays. The grandparents reported the children did not appear to have any mental health concerns and were not in need of any mental health services.

The social worker observed during a home visit on November 30, 2011, that the children were very comfortable in the paternal grandfather's presence and constantly interrupted him in an effort to draw his attention away from her. The children were affectionate and attached to the  paternal grandfather, as evidenced by touching his arm, sitting near his chair and seeking his permission to get snacks and books from the play area. The social worker observed the grandfather exercise appropriate parental discipline. She remarked that the grandparents "appear to be very invested in the well being of their grandchildren" and capable of meeting their needs. Jordon told the social worker he wanted to live with the paternal grandparents and visit his parents. Ja. said she liked living with the paternal grandparents. Justin was "very active" during the interview and made no statement regarding his preferences.

4

The paternal grandparents voiced their commitment to caring for the children under a permanent plan of legal guardianship which they believed would be in the best interests of the children. They were informed that, should legal guardianship be granted, the parents' visits would continue as ordered by the juvenile court. DCFS recommended a permanent plan of legal guardianship for the children.

On January 6, 2012, before the selection and implementation hearing under section 366.26 was held, mother filed a section 388 petition, stating "It is in my children's best interest for this court to provide me with further reunification services since I do not believe the grandparents are able or willing to properly care for my children." She requested "further reunification services to help [her] address any perceived shortcomings" and indicated she was "confident" she could "prove to the court that [she was] a good mother and [could] raise healthy and happy children."

The combined hearing under sections 388 and 366.26 was conducted over a period of months, concluding on August 28, 2012. In pertinent part, mother testified to her belief that the grandparents were not able to safely care for the children. She stated they did not maintain good hygiene practices, provide adequate medical and dental care or teach the children basic living and social skills. As examples of these deficiencies, mother indicated: aggressive stray dogs lived in the grandparents' neighborhood and Ja. had been bitten by a neighbor's dog; by the time Jordan visited a dentist, he required 10 fillings; Ja. had severe diaper rashes and open wounds; and the younger children did not attend preschool. Mother testified it was in the best interests of the children to be with her and not the grandparents because as she was their mother. Mother and the children loved each other and she would aid in their social development by teaching them age-appropriate skills such as learning how to swim and ride a bicycle.

The only changed circumstance about which mother testified was her pending change of occupation, from an escort to a landlord. Mother testified she shut down the Web site for her escort service the week before the hearing and she was in escrow to buy three houses. She intended to support herself and the children from the rental income.

The juvenile court denied the section 388 petition. After hearing all of the testimony, the court stated, "I don't find there are changed circumstances. I don't find there are even changing circumstances with this mother." Based on all of the information before it, the court also concluded it would not be in the children's best interests to be returned to mother.

As to the section 366.26 contested hearing, the court determined the children were adoptable, but found section 366.26, subdivision (c)(1)(B)(i), the so-called beneficial relationship exception, applied. The court continued: "The only place these children have ever felt safe is in the home of the grandparents. They feel sale there. It might not be the best home. There may be problems. The children feel safe there. So I'm going to grant the legal guardianship." The court appointed the paternal grandparents as the children's guardians, but retained jurisdiction. The parents' visitation with the children continued. Father had monitored visits while mother continued to have bi-monthly weekend visits, plus additional visits at Thanksgiving and Christmas.

## II. DISCUSSION

### 1. Section 388 Petition

Section 388, subdivision (a), provides in part: "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." Section 388 permits modification of a dependency order if it is established that there has been a change of circumstances *and* that the proposed modification would be in the best interests of the child. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.) The petitioning parent has the burden of proving both of these requirements by a preponderance of the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

6

The best interests of the child are of paramount consideration when a modification petition is brought after termination of reunification services. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) In assessing the best interests of the child, the juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

A modification petition "is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) A court abuses its discretion when its decision exceeds the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*Ibid.*)

The juvenile court found mother failed to show a change in circumstances in the 12 months between the termination of reunification services and the hearing on the section 388 petition. Substantial evidence supports the finding.

Mother presented virtually no evidence of any change in her living situation, relationship with the children, or understanding of the issues which led to the dependency court jurisdiction. Mother demonstrated an admirable commitment to maintaining visits with the children, driving 400 miles every other weekend to bring the children to her home in San Diego and return them to the grandparents' home in Lancaster. However, she had been doing this for a number of months before reunification services were terminated. Thus, it did not constitute a change in circumstances. And while mother had recently decided on a career move better suited to the raising of young children, her delay in making the change and the uncertainty of her ability to maintain an adequate income in her proposed new line of work meant the change of circumstance had yet to be effected. Clearly, the juvenile court's finding that mother did not demonstrate a change of circumstances is supported by the record.

7

So too is the court's finding mother failed to establish it would be in the children's best interests to be returned to her custody. Justin and Ja. were removed from the parents' home at very young ages and had spent over half of their lives in their current placement. According to Dr. Ambrose's report of the Evidence Code section 730 examination, while mother and Ja. seemed to be developing an attachment, the bond between mother and both Jordan and Justin appeared to be "quite tenuous." While the grandparents' home may not have been perfect, it provided the children with love, stability and consistent boundaries. Viewing this evidence in the light most favorable to the juvenile court's ruling, we conclude the court acted well within its discretion. The children had achieved permanence and stability in the care of their grandparents, who were meeting all their needs. Further reunification services for mother, much less placing the children in her custody, would have reversed that progress, disrupted their settled routines and exposed them to all of the stresses and uncertainties of mother's evolving situation.

"It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion[.]" (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 522.) This is not one of those rare occasions. The juvenile court did not abuse its discretion in denying mother's petition. (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.)


2. Order of Legal Guardianship


Section 366.26, subdivision (c)(4)(A) provides: "If the court finds that adoption of the child or termination of parental rights is not in the best interest of the child, because one of the conditions in clause (i), (ii), (iii), (iv), (v), or (vi) of subparagraph (B) of paragraph (1) or in paragraph (2) applies, the court shall either order that the present caretakers or other appropriate persons shall become legal guardians of the child [or] order that the child remain in long-term foster care . . . . Legal guardianship shall be considered before long-term foster care, if it is in the best interests of the child and if a suitable guardian can be found."

Here, the children had been placed with the paternal grandparents since November 4, 2009 and had lived with them on-and-off even before that time.  Jordan, the oldest of the children and therefore presumably the one with the strongest memories of living with his parents as a family, stated he wanted to live with his grandparents and continue to visit with his parents.   Six-year-old Justin and four-year-old Ja., had lived with their grandparents since they were two years old and ten months old, respectively.  The grandparents attended to all of the children's needs and provided a safe and stable home for the minors, who felt secure in their care.  Consequently, we find no error in the juvenile court's order of legal guardianship or the appointment of the paternal grandparents as the children's legal guardians.

### III.  DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KUMAR, J.[*]

We concur:

TURNER, P. J.

MOSK, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.