Filed 2/26/14  In re M.C. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | B251691 (Los Angeles County Super. Ct. No. CK62869) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. L.C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Amy Pellman, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Peter Ferrera, Senior Deputy County Counsel for Plaintiff and Respondent.

# INTRODUCTION

L.C. (mother) filed a Welfare and Institutions Code section 388[1] petition seeking to change a legal guardianship order over her daughters J.C. and M.C. The juvenile court denied the petition as not in the children's best interests, and mother appeals. We affirm.

# BACKGROUND

On March 30, 2006, the Los Angeles Department of Children and Family Services (Department) filed a petition pursuant to section 300 on behalf of four-year-old J.C. and five-year-old M.C. The petition as subsequently amended and sustained alleged that mother had a 10-year history of illicit drug abuse and was a current abuser of cocaine, marijuana, and methamphetamine, which rendered her incapable of providing her children with regular care and supervision. The petition further alleged that mother used illicit drugs in the children's home and in their presence. Mother also was alleged to have left the children home alone without adult supervision. Mother and Juan C. (father) were alleged to have a history of engaging in mutual, physical altercations with the children in the home.

The Department's March 2006 Detention Report stated mother's sister said that mother's drug of choice was "crack." M.C. said that mother smoked "weed." J.C. and M.C. said that mother and father were always fighting and that they did not want to return home with their parents. The Department took the children into protective custody. The juvenile court found a prima facie case for detaining J.C. and M.C. and ordered mother to participate in individual counseling, drug counseling, and random drug testing

In May 2006, the juvenile court sustained the amended section 300 petition. The juvenile court removed J.C. and M.C. from their parents' custody. Because mother's whereabouts were unknown, the juvenile court denied mother family reunification services pursuant to section 361.5, subdivision (b)(1). On June 7, 2006, the juvenile court placed the children in their paternal great aunt B.N.'s home.

---

[1] All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

The Department's November 22, 2006, Status Review Report stated that J.C. and M.C. appeared happy with and well cared for by paternal great aunt. They were reported to have a strong attachment to paternal great aunt. In October 2006, mother had informed a social worker that she was seven months pregnant, that she had enrolled in Maternity House where should could live during her pregnancy, and that she wanted to comply with court ordered services and restore visitation with her children. Mother was to attend 20 per week hours of counseling at Maternity House. Mother's counselor reported, however, that mother was making "little to minimal progress."

The Department's May 22, 2007, Status Report stated that paternal great aunt had provided a safe and stable home for J.C. and M.C. who appeared to be well adjusted in the home. Mother's Maternity House counselor reported that mother had a severe crack addiction and an explosive temper and had left the program. In January 2007, mother had given birth, and the Department had detained and placed the child in foster care. Following a brief period of incarceration, the Department was unable to contact mother. The report stated that mother had not been visiting J.C. and M.C. and had not established a close bond with them.

The juvenile court found that mother had not consistently and regularly contacted and visited J.C. and M.C.; she had not made significant progress in resolving the problems that led to the children's removal from their home; and she had not demonstrated the capacity and ability to complete the objectives of her treatment plan and to provide for the children's safety, protection, physical and emotional well being, and special needs. The juvenile court terminated mother's family reunification services. Mother was permitted to have monitored visits with J.C. and M.C., but only if she called 24 hours in advance.

The Department's September 27, 2007, Status Review Report reported that mother's whereabouts had been unknown until the Department learned that mother had been incarcerated since July 10, 2007. She had not participated in any programs since leaving residential treatment in December 2006. In early August 2007, mother told a social worker that she was going to enroll in an inpatient substance abuse program, that

she wanted to visit with J.C. and M.C., and that she would maintain contact with the social worker. As of the report's date, mother had not contacted the social worker and her whereabouts were unknown. The report recommended that the children be returned to father's custody.

According to the Department's March 25, 2008, Status Review Report, J.C. and M.C. were released to father on September 27, 2007, but were returned to paternal great aunt on December 21, 2007, after father was arrested for car theft and evading arrest. Mother whereabouts remained unknown. The children missed mother and wanted her to come back from Mexico—maternal grandmother told the children mother was residing in Mexico.

On August 6, 2008, the Department filed a subsequent petition pursuant to section 342 that alleged that father's whereabouts were unknown and that he had failed to provide the children with ongoing care, supervision, and the necessities of life. The juvenile court sustained the petition and set the matter for a guardianship hearing. In October 2008, the juvenile court appointed paternal great aunt to be the children's legal guardian. Pursuant to the guardianship, mother was permitted monitored visits "at the discretion of the legal guardian in the best interest of the children."

The Department's April 28, 2009, Status Review Report stated that J.C. and M.C. called paternal great aunt "mommy." The children reported that they had not seen mother for a significant period of time. They stated that they did not want to live with mother and were afraid that if they visited mother, they would have to leave paternal great aunt. The children stated that they loved paternal great aunt, enjoyed living with her, and did not want to leave. Mother was then incarcerated, but she expected to be released in May 2009.

The Department's June 1, 2009, Status Review Report stated that J.C. and M.C. visited with mother at the Children's Court on April 28, 2009. A social worker discussed with the children the possibility of visiting with mother. J.C. was excited, but M.C. appeared to be apprehensive and concerned that she would have to move out of paternal

4

great aunt's home. M.C. was more receptive to visits with mother when the social worker told her that she would not have to move from paternal great aunt's home.

On September 30, 2009, the juvenile court terminated jurisdiction. In September 2010, mother filed a section 388 petition seeking to regain custody of J.C. and M.C. The juvenile court denied the petition without setting the matter for a hearing.

In April 2011, mother gave birth to Christian. Christian apparently became a dependent of the juvenile court due to mother's 11-year-history of drug use, her current use of cocaine and marijuana, and her use of cocaine and marijuana while pregnant with the child. Christian's father, Salvador S., also had a history of illicit drug use.

In January 2012, mother was arrested for shoplifting. On February 9, 2012, the Department filed a section 388 petition requesting the juvenile court to change from unmonitored to monitored its order granting mother visitation with Christian. The Department alleged that mother had used Christian in the commission of a shoplifting offense by placing stolen items in the child's stroller. The juvenile court granted the petition.

Mother was released from custody on September 18, 2012. The juvenile court placed Christian in the custody of mother and the child's father on December 4, 2012.

On February 25, 2013, mother filed another section 388 petition seeking to change the juvenile court's order granting paternal great aunt legal guardianship over J.C. and M.C. without visitation. Mother requested a new order that she "[b]e provided with reunification services including family therapy and individual therapy for [J.C. and M.C.] with the ultimate goal of regaining" custody of her children. Mother claimed that she had been sober for two years, and that she had completed parenting classes, drug treatment, and "many other classes." She said that the new order would be better for her children because, among other things, her children were very important to her and she wanted to have a healthy relationship with them. The juvenile court reinstated jurisdiction and set the matter for a hearing.

In its response to mother's section 388 petition, the Department reported that mother had completed the case plan in Christian's case. Mother had provided the

Department with a letter stating that she was receiving individual therapy, and she had provided a letter that gave "an overall positive description" of mother's participation in the academic and life skills classes at Homeboy Industries. According to the report, mother had had no contact with J.C. and M.C.—their last contact of any type being at a McDonalds one week before Christmas in 2011.

M.C., then age 12, told the social worker she would feel bad about having regular visits with mother and attending therapy with mother because she did not feel like having a relationship with mother. The main reason M.C. did not want to have a relationship with mother was because it would take up too much of her time. M.C. attended catechism classes and invested a lot of time in school and did not want her school performance to be negatively affected by spending too much time with mother or in therapy. M.C. did not have any other fears or concerns about visiting mother. She stated, however, that she would probably feel "confused" during visits with mother because she knew nothing about mother. M.C. said she was happy and that paternal great aunt, whom she referred to as "mom," took good care of her. M.C. did not remember when she last had contact with mother. She and J.C. never spoke about mother. Asked if she had any memory of mother, M.C. responded, "I have only one memory of her . . . , that she left me abandoned."

J.C., then age 11, told the social worker that she would not be afraid to see mother, but that she would not want to leave her present home with paternal great aunt whom she loved and referred to as "mom." J.C. said that she and M.C. were very good students, which performance she attributed to living with paternal great aunt. Like M.C., J.C. could not remember the last time she had contact with mother. J.C. did not speak about mother with M.C. or paternal great aunt. Asked if she had any memory of mother, J.C. became emotional and stated she only remembered a night when she and M.C. were asleep in a room when someone suddenly turned on the lights. J.C. said she saw mother "smoking," and that the room and the rest of the home was "very smelly." Asked if she had any questions, concerns, or comments she wanted to share with the social worker, J.C. said, "I don't want to live with someone else."

6

Mother told the social worker that she last had contact with J.C. and M.C. at a McDonalds one week before Christmas in 2011. After the visit, mother called paternal great aunt almost daily to speak with her children, but was always told they were unavailable or busy. Soon, paternal great aunt asked mother to stop calling and she complied. Mother stated that she wrote to J.C. and M.C. a few times and sent birthday cards without response. She stated that she and the children did not know each other and that she wanted to develop a healthy relationship with her children with the ultimate goal of regaining custody and raising them in a healthy, positive environment. If the juvenile court determined that J.C.'s and M.C.'s interests were best served by remaining with paternal great aunt, mother would support that determination, but would still want to be a part of their lives.

Paternal great aunt told the social worker that she had had no contact with mother since the visit at the McDonalds one week before Christmas in 2011. She did not receive any letters or birthday or holiday cards from mother and denied that mother called regularly or at all after the McDonalds visit. She did not tell mother to stop calling her after the McDonalds visit, but she did tell mother to stop calling four years prior and mother had complied. The children did not speak of mother with paternal great aunt or ask her questions about mother.

The Department recommended that the juvenile court deny mother's section 388 petition for reunification services, but "strongly" recommended that paternal great aunt establish a visitation schedule for mother and her children that would allow the children to begin to connect with mother. It recommended that the guardianship letters be modified to include telephone contact between the children and mother with the ultimate plan of establishing a consistent visitation schedule. The Department stated that the children's feelings toward contact with mother were best described as "indifferent." The children were not, however, indifferent in their feelings about paternal great aunt. The children spoke very positively about paternal great aunt and their primary concern was to remain in her care. The Department believed that mother had made significant progress since J.C. and M.C. were removed from her custody, but that "the progress the mother

7

has made has not been maintained for a long period of time and the risk of destabilizing the children's current situation by granting the mother access to them outweighs the benefits to the children if Reunification services are granted to the mother at this point in time." The Department noted that mother recently had reunified with Christian.[2]

The hearing on mother's section 388 petition was held on September 9, 2013. Mother testified she had been sober since April 20, 2011, had completed a substance abuse program and parenting classes, and was participating in individual counseling. Mother said she was not requesting that J.C. and M.C. be returned to her that day. Instead, she wanted to have therapy with to them so that they could establish a relationship. Mother had not had any contact with J.C. and M.C. since just before Christmas in 2011. Mother testified that four months prior to the hearing, paternal great aunt told her to stop calling.

J.C. testified she did not want to have any contact with mother. J.C. said that she did not want contact with mother because she did not like mother as mother left her alone, and not because she was afraid she would be taken from paternal great aunt. J.C. said that she would feel more comfortable visiting with mother if another person was present, but she would not like to talk to mother even with someone else present. J.C. would not feel comfortable having telephone calls with mother. She was not afraid of mother. J.C. said she was not interested in having contact with Christian.

M.C. testified that she did not want any contact with mother. She said that the reason that she did not want contact with mother was not that it would take up too much time as she had told the social worker, but because she felt better with paternal great aunt. She testified that she would not feel comfortable having another person present to help facilitate contact with mother. M.C. did not have memories of being removed from

---

**2** Subsequently, in its June 4, 2013, Status Review Report in Christian's case, the Department recommended that the juvenile court terminate jurisdiction over Christian based on mother's and Christian's father's compliance with court ordered services. Finding that the conditions that led to jurisdiction over Christian no longer existed, the juvenile court terminated jurisdiction.

mother and did not know if mother had changed since then. She did not want to have telephone contact with mother.

Counsel for J.C., M.C., and the Department stipulated that mother was clean and sober and had completed her programs. Mother's counsel stated that mother no longer requested reunification and custody. Instead, she requested "visitation, either in a therapeutic setting or phone calls." She argued that the changes would be in the children's best interests because mother wanted her children to know that she loved them and "this is not their fault," and she wanted to establish a relationship with them.

J.C. and M.C.'s attorney asked that mother's section 388 petition be denied in full as not in the children's best interests. She argued that the children had a close bond with paternal great aunt, with whom they had lived for the past seven years, and no bond with mother. J.C. and M.C. had no interest in having a relationship with mother. Counsel for the Department also argued that mother's section 388 petition should be denied as not in the best interests of the children, but stated that "they are recommending monitored phone contact." The children's counsel opposed monitored phone contact because J.C. and M.C. had made clear that they did not want to have contact with mother. Phone contact would cause the children emotional stress. Counsel for the children noted that the juvenile court had seen J.C. "break into tears when trying to explain why she didn't have anything to do with her mother."

The juvenile court commended mother on her rehabilitation and found that there were "some changing circumstances," but denied mother's section 388 petition because it was not in the children's best interests. The court said to mother, "It appears you are remaining clean and sober and that's not reality [*sic.*] the issue today. The issue is would having contact with your two daughters, here, be in their best interest right now, and it may be a good time for you. It's not a good time for them. It's clearly not in their best interest. That could easily change. It may change. They may become curious as they get older to get to know you, find out who you are. Unfortunately, you did not get cleaned up until . . . recently. [¶] Your girls are still young, and even after they are 18, they may decide that they want to know you. That will be their choice, and they may decide they

9

want to know you before they are 18.  But, at this stage, this developmental stage, their lives, right now, they want stability, and they don't want to rock the boat.  They don't want to deal with changing their lives, just because it is the right time for you right now.  So just as they were patient, well, they didn't have a choice.  Right.  You're going to have to be patient."

The juvenile court encouraged paternal great aunt to allow J.C. and M.C. to have contact with mother if they wanted contact.  Any such contact was to begin in a "therapeutic office."  The juvenile court permitted mother to write letters to the children, which letters paternal great aunt could read and determine whether they were appropriate to give to the children.

## DISCUSSION

Mother contends that the trial court abused its discretion in finding that visitation was not in the best interests of J.C. and M.C.  The trial court acted within its discretion in denying mother's section 388 petition.

### A.     Standard of Review

We review the juvenile court's denial of a section 388 petition for abuse of discretion—i.e., whether the juvenile court's decision was arbitrary, capricious, or patently absurd.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'  [Citations.]"  (*Id.* at pp. 318-319.)

### B.     Relevant Principles

Section 388, subdivision (a) permits anyone having an interest in a dependent child to petition the juvenile court for a hearing to change, modify, or set aside a previous

10

order on the ground of changed circumstances or new evidence.[3]  If the petition shows changed circumstances or new evidence indicating that the proposed modification "may be" in the child's best interests, the juvenile court must hold a hearing on the petition within 30 days.  (§ 388, subd. (c); Cal. Rules of Court, rule 5.570(e), (f).)

If the juvenile court grants a hearing, the moving party must show by a preponderance of the evidence that changed circumstances or new evidence make the proposed change to an existing order in the child's best interests.  (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  [Citation.]"  (*Ibid.*)


C.     *Best Interests of J.C. and M.C.*

Although the juvenile court stated that mother had shown "changing"[4]—i.e., not "changed" circumstances, it appears to have based its denial of mother's section 388 petition on its finding that mother had failed to show that the proposed order would be in her children's best interests.  "It is not enough for a parent to show *just* a genuine change of circumstances under the statute.  The parent must show that the undoing of the prior

---

**3**     Section 388, subdivision (a) provides in pertinent part:  "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . or the child himself or herself . . . through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court or in which a guardianship was ordered pursuant to Section 360 for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

**4**     "A petition which alleges merely *changing* circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests.  [Citation.]"  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, italics added.)

11

order would be in the best interests of the child." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) "[T]he proper focus [is] on the *child's* interests, not the [parent's]." (*Id.* at p. 534, citing *In re Stephanie M., supra,* 7 Cal.4th at p. 323.)

Mother contends that the juvenile court abused its discretion in finding that visitation was not in the best interests of J.C. and M.C. because there was no showing that "controlled contact" with mother in a therapeutic environment would be "detrimental" to either child. Mother misstates the burden of proof. Mother had the burden to show by a preponderance of the evidence that visitation would be in the children's best interest. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) Neither the Department nor the children had the burden to show that visitation would be "detrimental" to J.C. or M.C.

Moreover, the trial court acted within its discretion in finding that visitation was not in the best interests of J.C. and M.C. At the time of mother's section 388 petition, J.C. and M.C. had lived with paternal great aunt for over seven years, regarded her as their mother, and were doing well under her care. Mother had largely been out of her children's lives for a number of years, and, as mother admitted, neither child knew mother. Both children testified that they did not want contact with mother, including telephone contact. J.C. apparently broke into tears when testifying about having contact with mother. Neither child wanted visitation with mother and visitation threatened to destabilized the children's lives. Thus evidence supports the conclusion that the juvenile court did not err in finding that visitation with mother was not in the children's best interests. (*In re Stephanie M., supra,* 7 Cal.4th at p. 317; *In re Kimberly F., supra,* 56 Cal.App.4th at p. 529.)

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, Acting P. J.


We concur:


KRIEGLER, J.


MINK, J.*

---

\*     Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.