Filed 8/1/22  In re A.D. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re A.D., A Person Coming Under the Juvenile Court Law. | B316962 |
| _____ | (Los Angeles County Super. Ct. No. CK85451) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| S.D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael C. Kelley, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

Appellant S.D. (Mother) appeals from a juvenile court custody and visitation order the juvenile court entered at the conclusion of dependency proceedings regarding her daughter, A.D., now age 16. The challenged order awarded sole custody of A.D. to A.D.'s father, R.J. (Father) and afforded Mother monitored visits. Mother first contends that permitting her joint legal custody and unmonitored visits would help preserve A.D. and Mother's relationship. But by the time the court issued the challenged orders, Mother's reunification services had been terminated for years, and A.D. had already been placed with one parent, so reunification with Mother was no longer a goal of the proceedings.

The court's decisions regarding custody and visitation were instead appropriately guided by A.D.'s best interests. As a result of Mother's failure to provide the court with any information about her current circumstances, as well as her failure to contact DCFS for over a year leading up to the challenged order, the record contains virtually no current information regarding Mother, her relationship with A.D., or how preserving that relationship might benefit A.D. The court had before it information regarding substance abuse and domestic violence issues that had, at an earlier point in the proceedings, warranted denying Mother custody and requiring Mother's visits be monitored. Mother offered no evidence to suggest that, since that earlier determination, she had addressed these issues. Rather, the court had before it only general reports from Father and A.D. that Mother's monitored visits with A.D. over the approximately

2

18 months leading up to the challenged ruling had been "periodic" and that Father and A.D. reported "no concerns" about the visits. On this record, we cannot say the trial court abused its discretion in concluding Mother had not addressed the issues that had previously warranted removal and monitored visitation, and that it therefore was not in A.D.'s best interests for Mother to have any custodial rights or unmonitored visits. Accordingly, we affirm.

## FACTS AND PROCEEDINGS BELOW

In separate dependency proceedings initiated in 2011, the juvenile court sustained a Welfare and Institutions Code section 300[1] petition based on Mother's history of substance abuse and inappropriate physical discipline of A.D.'s older half sibling that placed A.D. at risk of harm. In 2012, the case was terminated with the children in Mother's sole custody.

The instant dependency proceedings stem from a sustained 2013 section 300 petition alleging that domestic violence between Mother and her boyfriend (not Father) placed A.D. and three of Mother's other children at risk of harm. Mother informed DCFS she did not know the identity of A.D.'s father. The court initially placed A.D. with Mother and ordered family maintenance services. Mother struggled to cooperate with DCFS, however—at one point to such an extent that DCFS was unaware of Mother and A.D.'s whereabouts for an extended period of time, necessitating an arrest warrant for Mother and a protective custody warrant for A.D. In July 2016, the court granted a DCFS request under section 387 to remove A.D. from

_____

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

Mother, based on her lack of compliance with court orders and lack of cooperation with DCFS. Thereafter, the court ordered monitored visits with A.D.

In January 2017, DCFS reported Mother had begun consistently visiting A.D. and had a "positive parent[-]child bond" with A.D. During the following year, DCFS continued to report the visits went well, that Mother and A.D. shared a bond, and that A.D. wanted to live with Mother. By September 2018, the visits became sporadic. When the visits occurred, however, they went well. A.D. was beginning to understand she may not be returning to live with Mother, but she still appeared to have a "close bond" with her. In 2019, Mother's visits continued to be sporadic but also continued to go well when they occurred.

Mother's visits continued to be monitored. In April 2019, the juvenile court terminated Mother's reunification services based on Mother's failure to comply with drug testing and her minimal progress in services.[2] In September 2019, Mother was arrested for assault with a deadly weapon and possible great bodily injury, and was incarcerated.

Sometime in 2020, DCFS was able to locate Father, and a paternity test established he was the biological father of A.D. According to Father, Mother had told him he was not A.D.'s father when A.D. was a baby, and Father thus previously had not been involved in A.D.'s life. Father was not an offending parent in the dependency proceedings. In September 2020, the court removed A.D. from her foster placement and placed her in

---

[2] The court initially denied Mother reunification services, but this court reversed that denial. (See *S.D. v. Superior Court* (Sept. 11, 2017, B281851).)

4

Father's custody with family maintenance services.  The court later granted Father presumed father status.

Because A.D. had been placed with one parent, the court held regular hearings pursuant to section 364, to determine "whether continued [juvenile court] supervision [wa]s necessary." (§ 364, subd. (c).)  In connection with the first such hearing, in April 2021, DCFS reported that Father "ha[d] been able to maintain a suitable household for him and [A.D.]," but was not fully complying with DCFS.  Specifically, Father's work as a truck driver caused him to be frequently out of town, and DCFS expressed concerns about A.D. frequently being in the care of other relatives and even, on one occasion, with relatives outside the county, in violation of court orders.  Father also missed several DCFS check-in appointments and was difficult to reach. "There [was also] concern that . . . [F]ather ha[d] not provided DCFS with any verification that [A.D.'s] needs ha[d] been met, including being current on medical and dental exams," and DCFS's inability to confirm that A.D. was attending high school as both she and Father reported.

Mother did not contact DCFS after being released from prison in April 2020, so the DCFS reports after this date contain no information about her lifestyle, living situation, or relationship with A.D., save general statements by Father and A.D. that Mother "periodic[ally]" had monitored visits with A.D. (monitored by Father), and that A.D. and Father had "no concerns" about the visits.

In July 2021, Mother filed a section 388 request to change the court's earlier order terminating her reunification services, removing A.D. from her custody, and requiring her visits be monitored.  Section 388 permits a parent to, "upon grounds of

5

change of circumstance or new evidence, petition the court in" dependency proceedings "for a hearing to change, modify, or set aside any order of court previously made" based on that change being in the child's best interest. (§ 388, subds. (a)(1) & (b)(1); see *id.*, subd. (b)(1) [request must allege why the requested change is "in the best interest of the dependent child"].) Mother cited as the changed circumstances and new evidence supporting her request that Mother had completed various classes, had been "consistently attending" counseling, that Mother and A.D. shared a "close bond," and that Mother had been "consistently having great visits with [A.D.]" The court denied the request, and Mother did not appeal that denial.

In a November 2021 report submitted in advanced of the final section 364 hearing, DCFS reported that Mother's housing and employment status were still unknown, because she still had not made contact with DCFS. DCFS thus "kn[ew] little about this family" and Mother's "true relationship and involvement with [A.D.] [were likewise] not known." According to Father, Mother continued to "periodic[ally]" visit A.D. under Father's supervision at Father's home or in a neutral public setting. Neither A.D. nor Father reported any problems with the visits, but also did not provide any further detail.

DCFS further reported that Father was in "partial compliance" with court orders. DCFS had confirmed A.D.'s enrollment in school, albeit a month late. Father still had not taken A.D. for a regular dental or medical visit since being placed with Father, although he assured DCFS he would do so, and had already secured her some optometric care. Father and A.D. had declined counseling, but DCFS also reported that

6

neither appeared to need mental health services, even if counseling would likely benefit their new relationship.

Despite Father's partial compliance, DCFS recommended the court terminate its jurisdiction and place A.D. in Father's sole custody. DCFS explained that Father was nonoffending, that "[A.D.], age 15, has been in . . . [F]ather's care for over one year" without significant problems, and that "[A.D.] has always presented as self-sufficient, responsible and mature. [A.D.] has maintained that she is well-cared [for] and never reported any concerns or issues with being in . . . [F]ather's care or home." DCFS also "recognize[d] that . . . [F]ather stepped up when he discovered that [A.D.] is his biological daughter," which allowed her to avoid continuing foster care, and that Father "ha[d] demonstrated a commitment to caring for [A.D.] and her basic needs appear to be met."

Mother offered no evidence at the November 16, 2021 section 364 hearing, and the court thus considered only the DCFS report and argument from counsel. Mother did not oppose terminating juvenile court jurisdiction, but objected to and argued against DCFS's recommendations that the court award full legal and physical custody of A.D. to Father and that Mother's visits be monitored.

The court terminated juvenile court jurisdiction and issued a custody and visitation order in accordance with the DCFS recommendations. The court noted its ruling was based on the fact that "reunification services . . . for Mother were terminated back in 2019[,]" that "her contact with the child ha[d] been periodic at best," and that "Mother ha[d] not been in contact with [DCFS]." Mother timely appealed.

## DISCUSSION

Mother argues on appeal that the court erred both in denying her joint legal custody[3] of A.D. and in requiring that Mother's visits be monitored. We review custody and visitation orders in dependency proceedings for an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

When, as here, "the child remains in a parent's home, the court reviews the status of the case every six months under section 364; under such review, the court is not concerned with reunification, but in determining 'whether the dependency should be terminated or whether further supervision is necessary.' [Citations.] This is so because the focus of dependency proceedings 'is to reunify the child with *a parent*, when safe to do so for the child. [Citation.]' [Citation.]" (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20 (*Pedro Z.*).)

"[T]he juvenile court has broad discretion to make custody [and visitation] orders when it terminates jurisdiction in a dependency case." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4 (*Nicholas H.*).)

Generally speaking, "[w]hen making a custody [and, by extension, visitation] determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child." (*Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268; *In re Chantal S.* (1996) 13 Cal.4th 196, 206.)

Mother notes that, despite Mother's struggles and inconsistent visits with A.D., A.D. has "remained bonded to . . . [M]other and [their] visits were always reported to have gone

---

[3] Mother does not challenge the court's award of full physical custody to Father.

8

well." She argues that granting Mother joint legal custody and unmonitored visits would preserve and strengthen this bond with A.D. without endangering A.D., consistent with the "purpose" of the dependency scheme to "preserve and strengthen the minor's family ties whenever possible." (See § 202, subd. (a).) But this is only an independent goal of dependency proceedings until the court terminates reunification services (see *In re Marilyn H.* (1993) 5 Cal.4th 295, 309), which occurred in this case two years before the challenged custody and visitation ruling. Moreover, as noted, the court's goal in a section 364 hearing generally is not reunification, as the child has already reunified with at least one parent. (*Pedro Z., supra,* 190 Cal.App.4th at p. 20; *In re Adrianna P.* (2008) 166 Cal.App.4th 44, 59 ["the focus of the proceedings is to reunify the child with *a parent*, when safe to do so for the child"].)

We thus cannot conclude the trial court abused its discretion solely because it did not choose the path most likely to strengthen and preserve A.D.'s relationship with Mother. Nor can we conclude that, based on the record before it, the court abused its discretion in concluding that it would not be in A.D.'s best interests to facilitate a continuing relationship with Mother through unmonitored visits and joint legal custody. In determining the best interests of the child, a court should consider possible benefits from preserving the maternal bond. (See *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530 [disapproving of a best interest analysis that does not "address the child as a whole person, including his or her formative years with a natural parent"]; see also *In re J.M.* (2020) 50 Cal.App.5th 833, 848–849 [considering benefits of retaining ties with biological family in conducting best interest analysis].) But the

9

court did not have a record based on which the court could assess any such benefit and weigh it against possible risks. Mother offered no evidence at the final section 364 hearing. Because she did not maintain contact with DCFS in the 18 months leading up to the hearing, DCFS's reports in advance of the hearing contain no information about her current lifestyle, living situation, or employment. This means the court had no basis on which to determine the extent to which, if at all, Mother has addressed the substance abuse and domestic violence issues that led the juvenile court to previously remove A.D. from her care and order Mother's visits be monitored—restrictions the court concluded were still necessary as of June 2021 when it denied Mother's section 388 petition. That section 388 determination—which Mother did not appeal—reflects a conclusion that granting Mother unmonitored visits and partial custody would not have been in A.D.'s best interest as of June 2021. (See § 388, subds. (b)(1) & (d); *In re Christopher L.* (2022) 12 Cal.5th 1063, 1080 [section 388 petition depends in part on showing that requested change in child's best interest].) The only relevant information in the record about what happened since June 2021 is that Mother periodically visited A.D. without incident under Father's supervision. That is a far from sufficient basis on which the court could have concluded that the monitored visits and custody arrangement that were in A.D.'s best interests as of June 2021 no longer were. Thus, in large part due to an informational deficit of Mother's own making, the record amply supports the court's conclusion that permitting Mother unmonitored visits and/or partial legal custody would not be in A.D.'s best interests.

Mother also points to compliance difficulties DCFS has encountered with Father in arguing granting her partial legal

custody would be in A.D.'s best interest. Namely, she notes Father failed to timely enroll A.D. in school or schedule her medical and dental checkups. She argues that, were Mother to share custody with Father, she could help meet these needs. To support this proposition, she points to A.D. having had no medical or dental issues and having attended school consistently while in Mother's sole custody. This argument amounts to an incomplete comparison between one aspect of Mother and Father's respective parental abilities. Arguments that Father will not properly provide for A.D.'s needs do not support the conclusion that Mother *will* do so. And even if Mother's involvement would cause Father to better meet A.D.'s educational and medical needs, this does not address or neutralize the concerns that motivated the court to deny Mother legal custody and unmonitored visits in June 2021.

Based on the information available to the court at the final section 364 hearing, we cannot say the court abused its discretion in issuing the challenged order.

11

## DISPOSITION

The order of the juvenile court is affirmed.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


BENDIX, J.